BROWN, Chief Judge.
 

 11 Defendants, Latham Exploration Company, Inc., and Max Story, Reliance Drilling and Michael Rippetoe, appeal from the judgment of the trial court dismissing their motions for summary judgment and granting the motion for summary judgment of another defendant, Welsh Oil Company, Inc. For the following reasons, we affirm.
 

 Facts and Procedural Background
 

 Mobil Oil Exploration and Producing Southeast, Inc. (“MOEPSI”), filed a petition in a concursus proceeding on January 17, 2006, in order to determine the ownership of production revenues totaling $74,901.43 from 1993 to 2002. On April 28, 2009, MOEPSI filed a motion to deposit an additional $12,637.07 in production revenues into the registry of the court. The trial court granted the motion on May 5, 2009.
 

 Named as defendants in MOEPSI’s original and supplemental petitions were 17 individuals and/or entities with possible ownership claims to the mineral rights of an 11-acre tract of land in Claiborne Parish, Louisiana, originally owned by Valton and Rua Garrett (“the Garretts”). The large number of potential owners is a result of the Garretts executing three different oil and gas leases covering their 11-acre tract in 1981,1982, and 1990.
 

 The 1981 Lease
 

 The first lease, executed on June 2, 1981, between the Garretts and Jack Daniel, was for a primary term of one year, and thereafter as long as there was production from the leased land or from lands pooled therewith. Jack Daniel assigned an 81.25% working interest in the lease to LathamJjExploration Company, Inc. (“La-tham”), on September 1, 1981. On May 28, 1982, five days prior to the end of the one-year primary term, Latham executed a “Declaration of Unitization” which covered the 1981 lease of the Garretts’ 11-acre tract and included a portion of other land on which a producing well, the L. Giddens # 1 Well, was located. The declaration, however, was signed only by La-tham, and it was not filed until June 8, 1982, six days after the end of the primary term.
 

 The 1982 Lease
 

 On June 2, 1982, the last day of the first lease’s primary term, Latham executed a second oil and gas lease with the Garretts, covering the same 11-acre tract. The primary term for this lease was six months, and thereafter as long as there was production from the leased land or from lands pooled therewith. Within the six-month primary term Latham executed two declarations of unitization, both purporting to unitize the same 40-acre area for the L. Giddens # 1 Well. The first declaration, filed for record on July 15, 1982, was executed by Latham and Robert Sawyer, who
 
 *1151
 
 together purported to be the owners (to the extent necessary to execute the declaration) of the oil and gas leases covering the lands in the declared unit. The second declaration, recorded August 13, 1982, was signed by Latham, on behalf of Lexco 81-2 Drilling Program (“Lexco”), and Sawyer, as well as five other parties, and together they purported to be the owners (to the extent necessary to execute the declaration) of the oil and gas leases covering the lands in the declared unit. “Exhibit A” of both declarations, however, referenced the 1981 lease to describe the Garretts’ land covered by |sthe unit. Subsequent to filing the declarations, on September 28, 1982, Latham assigned its interest in the 1982 lease to Lexco. Latham, a Delaware corporation, was the managing partner of Lexco, an Oklahoma limited partnership. On December 27, 1993, Lexco assigned its interest in the 1982 lease to John and Kerry Welsh, who shortly thereafter assigned their interest to Welsh Oil Company, Inc. (collectively “Welsh”).
 
 [1]
 

 The 1990 Lease
 

 The third lease, which was executed on June 1, 1990, between the Garretts and Jim and Mary Love, covered the same 11-acre tract and had a primary term of two years.
 
 [2]
 

 On February 2, 2009, Welsh filed a motion for summary judgment claiming that the 1981 lease expired, that the 1982 lease was valid, and consequently, that it was entitled to the production revenues deposited into the court registry. In response, Latham filed an opposition to Welsh’s motion for summary judgment, and alternatively, filed its own motion for summary judgment asserting that the 1981 contract was the valid lease covering the 11-acre tract. A third motion for summary judgment was filed by defendants Max Story, Reliance Drilling and Michael Rippetoe (collectively “Story”), who acquired an interest in the 1981 lease in an area |4of mutual interest agreement, and it asserted only that the 1982 lease had expired.
 
 [3]
 

 A hearing on the motions was held on April 20, 2009. Based upon its finding that the 1981 lease had expired and that the 1982 lease was valid, the trial court granted Welsh’s motion for summary judgment, and denied Latham’s and Story’s motions, declaring Welsh’s entitlement to the production revenues deposited in the court registry. Latham and Story have appealed from this judgment.
 

 Discussion
 

 Appellate courts review summary judgment
 
 de novo,
 
 using the same criteria that govern the district court’s consideration of whether summary judgment is appropriate.
 
 Martin v. JKD Investments, LLC,
 
 42,196 (La.App.2d Cir.06/20/07), 961 So.2d 575. A motion for summary judgment shall be rendered “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B).
 

 
 *1152
 
 The underlying basis of this dispute is determination of the validity of the 1981 lease and/or the 1982 lease. As appellants have argued, a determination that the 1981 lease expired does not therefore render the 1982 lease valid. Nor does the mere fact that Latham executed a second lease with the Garretts mean that Latham believed that the first lease had expired, 15as it is common in the oil and gas industry to execute top leases. Top leases are leases granted by landowners during the existence of another mineral lease that become effective if and when the existing lease expires or is terminated. Accordingly, the first step we must undertake is to determine whether, as a matter of law, the 1981 lease expired on June 2,1982.
 

 A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition. La. R.S. 31:138. In the 1981 lease at issue, the primary term was one year, and thereafter as long as there was production from the leased land or from lands pooled therewith. Since there was never any production from the Garretts’ 11-acre tract, we must determine whether the 1981 lease was properly pooled with a producing land within the one-year primary term. To make this determination we must analyze the provision within the lease pertaining to pooling.
 

 Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. Each provision in a contract must be interpreted in light of the other provisions. La. C.C. art. 2050. In the event of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056.
 

 Clause 7 of the 1981 lease states, in pertinent part:
 

 Lessee is hereby granted the right as to all or any of the land described herein, without Lessor’s joinder, to combine, pool or Ifiimitize the acreage royalty or mineral interests covered by this lease, or any portion thereof, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units ...
 
 Lessee shall execute in writing and file for record
 
 in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage.... (Emphasis added).
 

 The “Declaration of Unitization” that was drafted with the intent of pooling the Garretts’ 1981 lease with, among others, a lease covering an adjoining tract of land on which there was a producing well, was executed on May 28, 1982. The declaration, however, was not filed for record until June 8, 1982. Thus, we are left to determine the effective date of a declaration when the lease required a lessee to both execute in writing and file for record an instrument identifying or describing the pooled acreage.
 

 Appellants argue that the lease does not specifically state that the unitization agreement must be filed prior to the end of the primary term in order to maintain the lease, and, as such, the May 28, 1982, execution of the agreement was sufficient. While we recognize that the lease does not state that the instrument must be filed prior to the end of the primary term, we note that it does require the lessee to
 
 *1153
 
 file the instrument for record. Thus, re-cordation of the executed writing was a prerequisite to effectively pool the Gar-retts’ land with the other lands and/or leases in the declaration.
 

 The terms of the lease are clear: since there was never any mineral production on the Garretts’ land, the only way for La-tham to have maintained the 1981 lease beyond its primary term would have been by successfully pooling the Garretts’ land with land in which there was | production. In order to do that, Latham was required to execute a written instrument identifying or describing the acreage to be pooled
 
 and file the instrument for record.
 
 The lease did not give the lessee the option of only executing a written instrument; it clearly required that both acts be performed. Therefore, as it applies to the 1981 lease, the declared unit could not have gone into effect until both required acts were performed, which was on June 8, 1982.
 
 See Union Gas Corp. v. Zion Lutheran Church of Mission Valley,
 
 No. 13-01-742-CV, 2003 WL 22478927 (Tx.App. Corpus Christi-Oct. 30, 2003) (citing
 
 Cummings: “Pooling Issues-Avoiding Pitfalls,’’
 
 1995 State Bar of Texas Advanced Oil, Gas & Mineral Law Course (stating that “[i]f the pooling clause requires recordation, it is not effective until actually filed in the appropriate county; execution and acknowledgment is insufficient.”)).
 

 Accordingly, we find that because there was neither any production on the Gar-retts’ 11-acre tract, nor a successful pooling of lands therewith by June 2, 1982, the 1981 lease expired. As such, the trial court did not err by dismissing Latham’s motion for summary judgment.
 

 Finding that the 1981 lease expired, we must now determine if, as Story argues, the 1982 lease expired at the end of its primary term as well. The 1982 lease was the same standard Bath form oil and gas lease as the 1981 lease. All provisions were the same, with the exception of the 1982 lease being for a primary term of six months. As was the case for the 1981 lease, there was never any production from the Garretts’ land. Therefore, |Kwe again must determine whether Latham unitized the Garretts’ land with land in which there was production prior to the end of the primary term.
 

 We will limit our review to the issue of whether, by way of the 1982 lease, Latham effectively pooled the Garretts’ land with producing land, and thereby maintained the 1982 lease beyond its primary term.
 
 [4]
 

 Because there is not an issue of whether the other lands and/or leases to be pooled with the Garretts’ were done in conformity with each lease’s respective pooling clause, the scope of our review is confined to the 1982 lease, and more specifically the pooling provision contained therein, to determine whether the declarations of unitization conformed therewith. Thus, with all other lands and/or leases in the declared unit being validly pooled, all that is required to sufficiently pool the Garretts’ land into the declared unit is a declaration of unitization that adheres to the requisites set out in the 1982 lease’s pooling clause.
 

 Clause 7 of the 1982 lease states that the “[l]essee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located,
 
 an instrument identifying or describing the pooled acreage
 
 ....” Based upon this provision, it is clear that reference to a particular lease was not a requirement to unitize the Garretts’ land. All that was required was the lessee executing and fil
 
 *1154
 
 ing an instrument that identified or described acreage to be pooled.
 

 The declarations of unitization at issue contained two separate exhibits: “Exhibit A,” which listed the leases, including the 1981 lease, and | ¡¡“Exhibit B,” a descriptive map of the lands to be pooled. Moreover, “Exhibit A” specifically stated its purpose in relation to “Exhibit B”: “Insofar and only insofar as the following leases describe lands covered by that certain 40.00000 acre unit outlined in Exhibit ‘B’ attached hereto.” Based upon the foregoing exhibits, it is clear that the acreage to be pooled was identified in the declarations. Furthermore, we note that regardless of the erroneous reference to the 1981 lease, the declarations were signed by La-tham, and Latham was still the leasehold owner of a valid and subsisting lease (the 1982 lease) covering the Garretts’ 11-acre tract. As such, the declarations of unitization, once executed and filed, met the criteria set forth in the lease to effectively pool the Garretts’ 11-acre tract with the other lands in the declared unit. Therefore, since the 1982 lease and the declarations of unitization that pooled the Garretts’ land with producing land were filed prior to December 2, 1982, the 1982 lease did not expire at the end of its primary term.
 
 [5]
 

 Accordingly, we find that the trial court did not err in holding that the 1982 lease was the valid lease, and consequently, that Welsh was entitled to the production revenues being held in the court registry.
 

 Lastly, we address Latham’s assignment of error regarding the trial court’s response to its request for written findings of fact and reasons for judgment. After the judgment of the trial court was rendered, Latham filed |ina request for written reasons in accordance with La. C.C.P. art. 1917. In response, the trial court had its oral reasons transcribed, and, as transcribed, made its written findings of fact and reasons for judgment. The costs of the transcription were assessed to Latham.
 

 When a party alleges that a trial court failed to comply with a timely request for written reasons for judgment under La. C.C.P. art. 1917, the proper remedy for the aggrieved party is to apply for supervisory writs or move to have the case remanded so that the trial court may have an opportunity to comply with the request.
 
 Anders v. Boudion,
 
 93-894 (La.App. 5th Cir.03/29/94), 636 So.2d 1029. Here, Latham has done neither. In fact, Latham’s argument on this assignment of error is perplexing in that it does not seem to seek any recourse. It merely posits that the trial court erred. Regardless, we find that this assignment of error is without merit.
 
 See Smoloski v. Smoloski,
 
 01-0485 (La.App. 3d Cir.10/03/01), 799 So.2d 599 (holding that the appellant’s assignment of error regarding the trial court’s failure to comply with La. C.C.P. art. 1917 was without merit since appellant failed to seek supervisory writs or move for remand, as well as because the trial court had its oral reasons transcribed and included in the record).
 

 Conclusion
 

 For the reasons stated above, the judgment of the trial court dismissing the motions for summary judgment of defendant-appellant, Latham Exploration Company,
 
 *1155
 
 Inc., and defendant-appellant, Max Story, Reliance Drilling and Michael Rippetoe, are affirmed. Further, the | ^judgment of the trial court granting the motion for summary judgment of defendant-appellee, Welsh Oil Company, Inc., is also affirmed. Costs of this appeal are assessed equally to appellants.
 

 [1]
 

 . In the same assignment instrument, Lexco assigned to Welsh its interest in the L. Gid-dens # 1 Well, as well as its interest in tire other four leases listed on "Exhibit A” of the July 15 and August 13 declarations of unitization.
 

 [2]
 

 . Both the 1981 lease and the 1990 lease had subsequent assignments that, for the purposes of this appeal, are irrelevant.
 

 [3]
 

 .Story contends in their appellate brief that if both the 1981 lease and the 1982 lease are invalid, then they would still be entitled to a portion of the production revenues under a valid 1990 lease.
 

 [4]
 

 . We note that the validity of the other leases declared, and the declarations' conformity with those leases' pooling provisions, have not been called into question.
 

 [5]
 

 . Because the “Declaration of Unitization” filed on July 15, 1982, was executed by La-tham, the lessee at the time, and because there has been no argument made by any party to cast doubt on its legitimacy, we pre-termit any discussion regarding the sufficiency of the subsequent “Declaration of Unitiza-lion” signed by Latham, on behalf of Lexco, prior to Lexco being assigned the 1982 lease. This pretermission is based on the fact that the July 15, 1982, "Declaration of Unitization” sufficed on its own to maintain the 1982 lease beyond its primary term.