CARAWAY, J.
hln this case, the appellants recognized that the landowners’ property was subject to an existing oil and gas lease that might terminate in four months at the end of the primary term of that lease. Appellants negotiated with the landowners an agreement for a new lease that would become effective the day after the primary term ended for the existing lease. The appellants paid the landowners the negotiated amount for the contract with a draft conditioned for payment “upon approval of title” *467 of the landowners’ property within 20 days. The appellants did not honor the draft, asserting instead that in the 20-day period the lessee of the existing lease had obtained a permit for a well which would maintain the lease and cloud the landowners’ title. The landowners sued for the payment on the agreement to lease, and the trial court rendered summary judgment in their favor. For the following reasons, we affirm.

Facts

In 2008, Ashley Ann Energy, L.L.C. (hereinafter “AAE”) was retained by Chesapeake Louisiana, L.P. to act as its agent with instructions to “identify and seek to lease properties having existing oil, gas, and mineral leases with an expiration date at the end of 2008.” In June 2008, April Smith, an AAE employee, contacted the plaintiffs, Amy and Roy Pilkinton, on Chesapeake’s behalf regarding the possibility of obtaining an oil, gas, and mineral lease on 86.20 acres in Bossier Parish. After the Pilkintons informed Smith that their property was currently leased to KCS Resources (hereinafter “KCS”), Smith discussed the possibility of Chesapeake/AAE |2obtaining a so-called top lease to become effective after the primary term of the KCS lease expired on December 1, 2008.
As a result of the negotiations, on August 7, 2008, the Pilkintons executed the contract now in dispute in this action in favor of AAE (hereinafter the “Agreement to Lease”). The contract was on a standard printed Bath form mineral lease with an additional “Exhibit A.” The primary term was listed as three years but was not to commence until December 2, 2008. Although the stated consideration typed on the Agreement to Lease was “$100 and other valuable consideration,” the Pilkin-tons were presented an AAE draft for $431,000 at the time of their execution of the Agreement to Lease.
Contained in Exhibit A to the Agreement to Lease were several special provisions reflecting the parties’ negotiations. Originally, this attachment only contained the first provision addressing the KCS lease. However, the Pilkintons proposed six additional provisions. Calvin Beasley, AAE’s owner, approved five of the requested provisions, including the second numbered provision of Exhibit A. The three pertinent provisions of Exhibit A are as follows:
1. This lease is expressly made subject to that Oil and Gas Lease dated December 1, 2005 from Roy L. Pilkinton and Amy H. Pilkinton to KCS Resources, Inc. (the “Prior Lease”), a copy of which is recorded in Bk. 1361 Pg. 635, to the extent of its validity; and Lessee herein accepts this Lease subject to the terms of the Prior lease. This lease is a “Top Lease,” insofar and only insofar as it includes land and depths described in the Prior Lease. It is not the intent of Lessor and Lessee to cloud or in any way to impair any rights, titles, and interests, if any, of the parties arising under the Prior Lease. This lease is subject to the Prior Lease and Lessee recognizes that this Lease, although describing lands and depths inclusive of depths held under the Prior Lease, will cover and affect the lands and depths |.^described in the Prior Lease only following the termination of the Prior Lease. Therefore, upon the expiration, release, or termination of the Prior Lease, in whole or part, Lessor shall notify Lessee in writing and Lessee shall have 10 days from receipt of such notice to make payment of the remaining bonus to Lessor based on the proportionate lands available from the Prior Lease. Upon receipt of such payment, this Lease will be deemed to cover and *468 include all lands and all depths so terminated in, on, and under Prior Lease. Specifically, when said Prior Lease expires, as to all or any portion of the lands or depths covered thereby, during the primary term of this Lease or any extension thereof, this Lease shall immediately and automatically include and become effective as to such lands or depths, subject to payment of the remaining bonus as set forth herein. Provided, however, that upon the expiration of the primary term of this Lease, if the Prior Lease has still not expired, terminated, or release of record, in whole or part, then this Lease, insofar as to lands and depths maintained under the Prior Lease, shall expire and shall never become effective as to such lands and depths. In any event, Lessor represents and warrants that Lessor has not executed or entered into any renewal or other agreement to extend the term or renew the Prior Lease, and furthermore, Lessor covenants and agrees not to execute any agreement to extend, renew, amend, or modify the term of the Prior Lease during the primary term of this Lease. This provision shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors, assigns, and legal representatives.
2. Lessor makes no express or implied warranty of title whatsoever, and Lessor shall have no obligation to return any bonus consideration or benefits received under any of the terms hereof, including, but not limited to royalties, shut-in payments, or other monies paid to Lessor on account of a failure of title. Lessee takes this lease at its own risk and peril.
[[Image here]]
5. To the extent of any conflict between the terms of this addendum and the lease form to which it is attached, the terms of this addendum shall control.
In consideration of executing the Agreement to Lease, the parties negotiated and agreed that the Pilkintons would initially receive one-fourth of the total bonus payment of $20,000 per acre. The other three-fourths of the bonus would be paid in the event that KCS’s lease terminated. Given the choice of a check or draft, the Pilkintons chose to receive their one-fourth bonus payment in a draft, believing it to be the safer option. Upon htheir signing of the lease, they were given a draft for $431,000. On the face of the draft, however, AAE included a provision that stated “upon approval of title but not later than 20 banking days after sight.” The Pilkin-tons signed and deposited the draft with their bank for collection on August 8, 2008. On August 14, the Agreement to Lease was recorded by AAE in the Bossier Parish records.
On August 21, 2008, the Louisiana Department of Natural Resources issued KCS a permit to drill an oil and gas well. While the permit was for a neighboring tract, the tract was within the same unit containing the Pilkintons’ property. AAE considered this permit for a unit well as a title defect and ordered their bank to dishonor the draft. AAE’s bank did not receive the notice to dishonor the draft within the 20 banking days; however, it was not given instructions by AAE to honor the draft. While AAE asserts that the Pilkintons received notification, the Pilkin-tons dispute that notice of AAE’s refusal to honor the draft was ever given within the 20 banking days. On September 22, 2008, AAE executed and recorded a release of the Agreement to Lease, and a week later, the Pilkintons’ bank returned the draft and informed the Pilkintons that it was not honored.
*469 Due to Chesapeake and AAE’s failure to pay the draft, the plaintiffs filed suit against them on November 21, 2008. On July 1, 2009, the Pilkintons filed a motion for summary judgment to determine the validity of the Agreement to Lease and to order the defendants to pay the agreed upon consideration. On October 2, 2009, the defendants filed a cross-motion for summary judgment.
| -After a postponement of the hearing on the motions, on September 10, 2010, the plaintiffs filed a motion for leave to file a first supplemental and amended petition. Since the KCS lease had allegedly expired, the Pilkintons desired to amend the petition to seek recovery of the additional three-fourths bonus payment ($1,293,000) owed under the Agreement to Lease. Chesapeake and AAE opposed the amendment and asked the court to resolve the motions for summary judgment prior to deciding whether the Pilkintons could amend them petition. The court set all of these motions for hearing on November 8, 2010.
On December 20, 2010, the district court issued its opinion, granting the plaintiffs’ motion for summary judgment, and denying the defendants’ cross-motion for summary judgment. The court also granted the plaintiffs’ request to file their supplemental and amended petition. The trial court held that:
In the Court’s view, none of the jurisprudence relied upon by the parties in this case had lease language as clear and precise as the language in this “top lease.” Defendants further clearly and unambiguously manifested their intent to be bound by the “top lease” through their delivery of the draft payment to the Petitioners as consideration and through their recordation of the “top lease” in the Bossier Parish conveyance records.
As a result of this adverse ruling and the $431,000 judgment against them, the defendants filed this appeal which has been certified by the district court as a final partial judgment.

Discussion

The defendants first assert that the 20-day title review period of the draft (hereinafter the “20-day Provision”) must be considered along with the |fiother provisions of the Agreement to Lease and given effect.[1] They contend that the trial court’s ruling erroneously discarded the 20-day Provision. Asserting the application of the 20-day Provision, the defendants argue to this court that the Agreement to Lease “never became effective” because they “learned of a title defect (the fact that the pre-existing lease of the Pilkintons’ mineral interests would not expire thus rendering the object of the proposed mineral lease impossible), dishonored the draft, and notified the Pil-kintons within the allowed time period.” Notably, however, as acknowledged in oral argument before this court, the defendants do not dispute that in the absence of the KCS drilling permit or any other title issue discovered in the 20-day period, they could not dishonor the draft and were obligated for the $431,000 payment.
Appellate courts review summary judgments de novo, while considering the record and all reasonable inferences drawn from the record in the light most favorable to the non-movant. Hines v. Garrett, 04- *470 0806 (La.6/25/04), 876 So.2d 764; Adams v. JPD Energy, Inc., 45,420 (La.App.2d Cir.8/11/10), 46 So.3d 751, writ denied, 10-2052 (La.11/12/10), 49 So.3d 892; Austin v. Bundrick, 41,064 (La.App.2d Cir.6/30/06), 935 So.2d 836. A material fact is one that potentially ensures or precludes recovery, affects a party’s ultimate success, or determines the outcome of the dispute. Hines v. Garrett, supra, citing Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730. A summary judgment shall be |7rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Like contracts in general, a mineral lease is the law between the parties and regulates their respective rights and obligations. Winnon v. Davis, 32,988 (La. App.2d Cir.5/15/00), 759 So.2d 321 as cited in Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145. Article 2046 states that when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. Although it is necessary that mineral leases be in writing, it is not essential that the lessee sign the written instrument; what is required is that lessee indicate consent to lease agreement. Fomby v. Columbia County Development Co., 155 La. 705, 99 So. 537 (1924); St. Romain v. Midas Exploration, Inc., 430 So.2d 1354 (La.App. 3d Cir.1983).
The Louisiana Mineral Code provides for the lessor’s warranty obligation in Article 120, as follows:
A mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited. The liability of the lessor for breach of warranty is limited to recovery of money paid or other property or its value given to the lessor for execution or maintenance of the lease and any royalties delivered on production from the lease.
La. R.S. 31:120.
Top leases are leases granted by landowners during the existence of another mineral lease that become effective if and when the existing lease |sexpires or is terminated. Mobil Oil Exploration and Producing Southeast, Inc. v. Latham, 44,996 (La.App.2d Cir.2/3/10), 31 So.3d 1149. As a legal right, the top lease exists at its inception as a mere hope or expectancy in the extinction of existing superior leasehold rights, which extinction will confer upon the top lease owner the essence of a mineral lease, i.e., the right to explore for and produce minerals. Patrick G. Tracy, Jr., The Effects of Top Leasing in the Louisiana Law of Oil and Gas, 43 La. L.Rev. 1189 (1983).
The parties cite and discuss this court’s ruling in Texas General Petroleum Corp. v. Brown, 408 So.2d 288 (La.App. 2d Cir. 1981). In that case, the lessors of the leases expressly excluded any warranty against pre-existing mineral leases still in effect, “not even for return of bonus monies.” The drafts for the bonus payments for the leases were conditioned “upon approval of title ... by drawee not later than 60 days.” Despite title problems with pri- or unexpired leases which were recognized by the lessee during the 60-day period, the drafts were paid for the bonus monies at the end of the 60-day period. The lessee brought suit claiming the bonus payments were made in error as its bank should not have honored the drafts. In rejecting the lessee’s claims, this court found no conflict in the non-warranty provision of the lease and the lessee’s 60-day period to deter *471 mine the existence of any title issue with the prior leases. “The terms of the leases and the language of the drafts strongly support the conclusion that plaintiff had 60 days to decide whether it could succeed in getting the desired releases [of the prior leases].” Id. at 291. After the end of the 60-day period with payment made to the lessors, the non-warranty provision was given |fleffect. This court refused to require the return of the bonus monies for any error in payment as claimed by the lessee.
While the Texas General ruling is informative for its effort to resolve conflict and give meaning to the two contractual provisions in question, this dispute concerns a third provision in the parties’ lease contract in addition to its non-warranty provision and the 20-day Provision. We must therefore consider the effect of the KCS lease provision contained in paragraph 1 of Exhibit A to the Agreement to Lease. The instruction of Civil Code Article 2050 is significant as “[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.” La. C.C. art. 2050.
The Agreement to Lease was signed in August 2008 by the Pilkintons in exchange for the draft even though a lease in complete force and effect was only to become effective on December 2, 2008. The KCS lease provision in Exhibit A explained the reason for this delay, as follows:
This lease is subject to a Prior Lease and Lessee recognizes that this Lease ... will cover and affect the lands at depths described in the Prior Lease only following the termination of the Prior Lease.
Emphasis added. The KCS lease was therefore recognized as being in full force and effect through the end of its primary term on December 1 and the new- AAE lease might only then become effective. Notably, the parties acknowledged that the Agreement to Lease and its recordation were not intended “to cloud” the title and ownership of the KCS lease.[2] An important |incorollary of that understanding by the parties is that the continued existence of the KCS lease, at least during its primary term, was not a cloud on the agreement which they entered in August 2008.
As outlined in paragraph 1 of Exhibit A, the parties’ agreement of August 2008 was clearly a prospective agreement for a lease that conditionally might become effective on December 2. Their contract was exécu-tory and contingent. For the initial down payment of one-fourth of the bonus payment, the Pilkintons agreed to lease and the defendants agreed to acquire the lease upon the happening of a condition — the eventual expiration of the KCS lease. They agreed to become bound in this exec-utory contract in August, and they might later become bound as lessor and lessee in a new lease upon certain conditions. AAE’s recordation in August of the Agreement to Lease protected its rights in this executory contract to lease under the law of registry in accordance with Civil Code Article 3338(3). Upon such recordation, a third party could not obtain lease rights *472 from the Pilkintons to the detriment of the defendants’ rights under the Agreement to Lease.
The KCS lease provides for a primary term of three years that ended December 1, 2008. The lease contains the typical habendum clause[3] allowing the lease to extend “as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein h provided.” Thus, for the conditional secondary term of the KCS lease to arise, the events set forth in its habendum clause had to be occurring on December 1, 2008, and thereafter. With this governing principle of the KCS lease, KCS’s permitting of a proposed unit well affecting the Pilkintons’ property in August was not an event by itself having any relevance to the maintenance of the KCS lease under the terms of its haben-dum clause. As indicated by the jurisprudence, the act of permitting a well, even if it had occurred on December 1, was insufficient to extend the KCS lease beyond its primary term under the terms of the lease.[4] A permit is not the equivalent of production nor is it one of the stated manners for lease maintenance short of production specified in the KCS lease for its extension under the habendum clause.
With this understanding of paragraph 1 of Exhibit A and the effect of the KCS lease, it is clear that the parties’ agreement was a binding contract to acquire a lease upon their execution of the Agreement to Lease and the payment of the $431,000 draft. Moreover, this executory agreement could result in an actual oil, gas and mineral lease effective December 2, 2008, irrespective of the well permit which KCS obtained in August. The events which might allow the Agreement to Lease to become an effective lease on December 2, 2008, as the parties contemplated, could only be measured on December 1, 2008, and thereafter by a determination of whether the KCS lease remained viable after the end of its primary term. This construction of |Ti>the parties’ agreement obligates defendants to pay the $431,000 draft. However, the defendants seek the application of the 20-day Provision which conditioned AAE’s payment of its $431,000 obligation and allegedly released them of that obligation.
The 20-day Provision is asserted by defendants as allowing them an additional 20 days to approve the title to the Pilkintons’ land before their $431,000 obligation became binding. Although we assume for purposes of this summary judgment that the Pilkintons agreed to this condition, the draft’s meaning of “approval of title” in the context of the parties’ overall agreement could not involve the acknowledged existence of the KCS lease as amounting to any cloud upon the Pilkintons’ title and ownership to their property. Likewise, just as the KCS well permit did not have any bearing in August 2008 upon whether the KCS lease might be extended beyond its primary term on December 1, 2008, and thereafter, the KCS well permit was not a flaw in the Pilkintons’ title and ownership of their property. The parties had agreed by their executory agreement that (1) the property was subject to the KCS lease; (2) *473 the Pilkintons’ land would become leased on December 2 if the KCS lease terminated; and (3) AAE would pay $431,000 to obtain the executory contract and an additional payment if the KCS lease terminated. None of these tenets of the agreement was altered by the KCS permit, and AAE’s conditional right to acquire the December 2 lease remained the same after the permit. Accordingly, the KCS well permit is not a title flaw falling within the meaning of “approval of title” of the 20-day Provision when the overall context of the parties’ contract is | ^considered.[5] The 20-day Provision therefore did not allow AAE to refuse to honor its $431,000 payment for the Agreement to Lease.
Alternatively, the defendants argue in their second assignment of error that under Civil Code Article 1949, error vitiated the parties’ consent at the time of the August 2008 contract and that genuine issues of material fact exist surrounding such error. Defendants claim that the Pilkintons knew that KCS planned to drill a well affecting the KCS lease and “that, if Ashley Ann and Chesapeake knew of such imminent drilling, they would not have been interested in leasing the Pilkintons’ property.” Defendants cite the following exchange in the deposition of Roy Pilkin-ton in support of their argument:
Q. You said KCS did talk to you before you entered into the top lease; correct?
A. Right.
Q. Okay. And when you talked to KCS you say they did tell you about wanting to drill a well?
A. Yeah.
Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party. La. C.C. art. 1949. Under Civil Code Article 1848, testimonial proof may be used against a written contract to show a vice of consent which includes error. La. C.C. art. 1848 and Revision Comment (b).
The trial court rejected this claim of error by the defendants after “considering the clear terms” of the Agreement to Lease. As reviewed 114above, both parties to the contract acknowledged the continuing existence of the KCS lease. The parties also acknowledged in the Agreement to Lease the possibility of KCS drilling its lease and maintaining it beyond December 1, 2008, into the conditional extended term of that lease. If such event occurred, the defendants’ additional payment for the new lease would not be owed on December 2. Circumstantially, without any contact by the parties with KCS, the KCS lease itself implies that the company would desire to develop its investment in the lease by exploring for oil and gas during the remainder of the primary term of the lease. Mr. Pilkinton was not a KCS official responsible for a drilling decision nor was it shown that the KCS employee with whom he had contact had made a decision to drill a well. Thus, regardless of Mr. Pilkinton’s understanding, the drilling of a well by KCS remained a clear contingency. The defendants’ intent for their acquisition of the Agreement to Lease was given in full view of the contingency for the extension of the KCS lease after December 1 which might result from a decision by that company to drill. Such decision may have been in the works on August 7, 2008; yet that was an accepted risk by the defendants upon entering the Agreement to *474 Lease. We therefore agree with the trial court that the cited testimony of Roy Pil-kinton does not show or raise a material issue of fact regarding error in the formation of the contract.

Conclusion

For the foregoing reasons, the partial summary judgment of the trial |1Bcourt in favor of plaintiffs is affirmed. Costs of appeal are assessed against appellants.
AFFIRMED.

. The Pilkintons' argument that they never agreed to the 20-day Provision despite their acceptance of the draft and the execution of the Agreement to Lease is not appropriate for resolution by a motion for summary judgment. For review of this summary judgment, therefore, we will assume that the parties agreed to the inclusion of the 20-day Provision on the draft.

. In Smith v. Kennon, 188 La. 101, 175 So. 763 (1937), the court addressed a top lease which was executed by the lessor to be effective during the primary term of a prior lease owned by the plaintiff. The court found that the plaintiff stated a viable cause of action against his lessor for the lessor’s repudiation of the lease contract by the execution of the top lease. The parties in this dispute did not execute such a top lease but instead executed an agreement to lease which might result in a lease following the possible termination of the KCS lease.

. La. R.S. 31:115 and Comment; La. R.S. 31:133; O'Neal v. JLH Enterprises, Inc., 37,432 (La.App.2d Cir.12/1/03), 862 So.2d 1021.

. See Allen v. Continental Oil Co., 255 So.2d 842 (La.App. 2d Cir.1971), writ denied, 260 La. 701, 257 So.2d 156 (1972), and Wehran v. Helis, 152 So.2d 220 (La.App. 4th Cir.1963), interpreting the language in the KCS lease requiring that at the end of the primary term the lessee must be “then engaged in operations for drilling, completion or reworking” of a well.

. This ruling does not mean that a title flaw, such as another party’s ownership of a mineral servitude burden on the Pilkintons’ land, could not have caused the 20-day Provision to operate in AAE’s favor under the rationale of Texas General Petroleum, supra.