Judgment rendered April 14, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,871-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

AMBER, LLC                                    Plaintiff-Appellant

versus

WELSH OIL CO., INC.                           Defendant-Appellee

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 68,507

Honorable Charles A. Smith, Judge

* * * * *

SHUEY SMITH, LLC                     Counsel for Appellant,
By: John M. Shuey, Jr.               Amber, LLC

BLANCHARD, WALKER,                   Counsel for Appellee,
O'QUIN & ROBERTS                     Marathon Oil Company
By: Stacey Denise Williams

BLANCHARD, WALKER,                   Counsel for Appellees,
O'QUIN & ROBERTS                     Welsh Oil Company, Inc.,
By: William Timothy Allen, III       and Blackbeard Operating
                                     East, LLC

HARGROVE, SMELLEY & STRICKLAND        Counsel for Appellees,
By: T. Issac Howell                   Lilla White Simms,
    Paul Alan Strickland              Mary Simms Thomas,
    Jonathan James Rose               Lilla Simms Benefield,
                                      William L. Simms, and
                                      Cynthia Simms Wedgeworth

* * * * *

Before MOORE, PITMAN, and STEPHENS, JJ.

**STEPHENS, J.**

This appeal involves a dispute over ownership of mineral rights in a 40-acre tract of land in Webster Parish, Louisiana. The trial judge, in ruling on opposing motions for summary judgment filed by plaintiff and defendants, found in favor of defendants. For the reasons set forth below, we affirm the judgment of the trial court.

## PROCEDURAL HISTORY AND FACTS

This litigation began in 2008, when Amber, LLC ("Amber"), filed suit against Welsh Oil Co., Inc. ("Welsh"), seeking a declaratory judgment as to ownership of certain rights to a 40-acre tract of land in the Northwest Quarter of the Southeast Quarter of Fractional Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana (the "Property").

Amber asserted ownership of three oil and gas leases covering the Property:

> Oil, Gas and Mineral Lease from William P. Simms and Lilla White Simms to Art Machin & Associates, Inc., dated January 29, 1974, covering the Property, and recorded in Conveyance Book 430, Page 270, and amended by act recorded in Conveyance Book 447, Page 118 ("1974 Lease").

> Oil, Gas and Mineral Lease from William P. Simms and Lilla Emm White Simms to Art Machin & Associates, Inc., dated April 28, 1975, covering the Property, together with Lot 3 and the East Half of Northeast Quarter of Southwest Quarter of Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana, and recorded in Conveyance Book 448, Page 124 ("1975 Lease").

> Oil, Gas and Mineral Lease from Erma C. Simms Jones and Barbara Anita Simms to Austral Oil Company, dated October 18, 1977, covering 90 acres, described as the South Half of the Southeast Quarter and the Southeast Quarter of the Southeast Quarter of Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana, and recorded in Conveyance Book 488, Page 560.

Amber had acquired ownership of the leases by an Assignment and Bill of Sale dated March 1, 2003, with the assignors[1] conveying all of their right, title and interest in their oil gas and mineral interests within the geographic boundaries of the West Half of the Southeast Quarter (W/2 SE/4) of Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana.[2]

### *History of the Leases and Production from the Wells*

On January 29, 1974, William P. Simms and Lilla Emm White Simms (hereinafter sometimes referred to as the "Simmses") granted to Art Machin & Associates, Inc. ("Machin"), lessee, mineral rights to the Property. This agreement, the 1974 Lease, provided for a primary term of three years. By amendment dated April 14, 1975, the 1974 Lease was amended to cover only those depths between the surface of the earth and 10,000 feet below. A second amendment to the 1974 Lease, also dated April 14, 1975, rewrote paragraph 7, regarding pooling and unitization, to provide for 80-acre units for the production of oil.

By Declaration of Unit dated April 15, 1975, Machin declared the Property and the adjacent Lot 2 (in partial Southwest Quarter of Northeast Quarter, Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana) to be in a single operating unit for the development and production of oil and casinghead gas. The Simmses had granted Machin an

---

[1] Assignors were APTCO, Inc., Michael S. Bloom and Marilynn Bloom, Elliott Oil Corp., Donald Bradley Foster, Art Machin and Patsy Machin, Sidney McMillan and Bill McMillan, O. L. McQuay and Meda McQuay, Osprey Resources, Inc., Deana F. Templeton and John Templeton, and Machin & Associates, Inc.

[2] Because the 1975 Lease also covered lands outside the West Half of the Southeast Quarter, the description of the 1975 Lease as described in Exhibit A attached to and made part of the Assignment and Bill of Sale stated that the 1975 Lease was conveyed "Insofar and only Insofar as said lease covers the NW/4 SE/4 Section 5-23N-9W, Webster Parish, LA."

Oil, Gas and Mineral Lease on this additional property on December 31, 1974. Unlike the 1974 Lease, which the parties amended, *this December 1974 lease contained depth restriction language limiting depth to 10,000 feet below the surface*. Together the two tracts comprised nearly 80 acres. The Declaration of Unit specifically identified the 1974 Lease, as well as the other lease, executed by the Simmses and Machin on December 31, 1974, on Lot 2. On April 15, 1975, Machin received a permit to drill the W. P. Simms No. 2 well on Lot 2. The well was to be drilled into the Pettit Formation, with a potential total depth of 6,000 feet. The W. P. Simms No. 2 was completed on June 8, 1975, and production began some time that year.

During this time, on April 28, 1975, Machin obtained the 1975 Lease from William P. Simms and Lilla Emm White Simms. The 1975 Lease covered the Property, together with Lot 3 and the East Half of the Northeast Quarter of the Southwest Quarter. Paragraph 7 of the 1975 Lease was amended to provide that any units for the production of oil were to be 160 acres instead of 40 acres. The 1975 Lease provided for a primary term of five years.

The 1975 Lease was executed just two weeks after the 1974 Lease had been amended to provide for a depth restriction from the surface to 10,000 feet below surface and 13 days after Machin had obtained the permit to drill the W. P. Simms No. 2 well, which was to be the well for the 80-acre voluntary unit Machin created on April 15, 1975. The 1974 Lease described 40-acre production units initially; this was changed to 80-acre units via amendment, and the 1975 Lease provided for 160-acre units for production. The 1974 Lease initially contained no depth specification or restriction; however, by amendment in 1975, the lease was limited to only those depths

3

between the surface and 10,000 feet below the surface. The 1975 Lease contains no depth restrictions. Otherwise, the two leases are identical: they cover the Property, although the 1975 Lease covers additional lands, and they provide for the same royalty.

The W. P. Simms No. 2 well continued production for many years, albeit under a different name. Production from the W. P. Simms No. 2 (renamed the W. P. Simms A. No. 1) held the 1974 Lease until the well (then named the PET RA SUHH) was included in the fieldwide unit, the NSRR PET RB SU. Production from the fieldwide unit held the 1974 Lease until production from the unit ceased in December 1996. In the meantime, the Property was included in the 8900 CV RA SUD, created by Order 104-R, effective March 2, 1995. The unit well, the E.S. Jones No. 7, produced from March 1995 through August 2008.

Welsh is the owner of an October 28, 2005, Oil, Gas, and Mineral Lease ("2005 Lease") on the Property and other lands granted by Lilla White Simms, et al. The 2005 Lease, which was for a primary term of two years, covered the Property, as well as other land in Section 5, Township 23 North, Range 9 West, Webster Parish, Louisiana. The 2005 Lease was limited to those formations below 6,000 feet and provided for a lessor's royalty of 1/5 rather than the standard 1/8. The 2005 Lease was a top lease as to depths shallower than 10,000 feet.

In its petition for declaratory judgment filed on August 15, 2008, Amber alleged that a cloud on its title to the 1974 Lease and 1975 Lease as to depths below 6,000 feet from the surface was created when Welsh obtained the 2005 Lease.

4

Amber sought a judgment against Welsh declaring that both the 1974 Lease and the 1975 Lease were valid as to rights below 6,000 feet as to the Property, and that any rights claimed by Welsh under the 2005 Lease as to rights below 6,000 feet be declared null and void.

Amber added Marathon Oil Company ("Marathon") as an additional defendant in 2011, alleging, *inter alia*, that Welsh had conveyed ownership of the 2005 Lease to Marathon effective December 1, 2005, reserving an overriding royalty interest. According to Amber, the 1974 Lease and the 1975 Lease had been maintained in accordance with their terms, as to all depths covered thereby, by drilling on and production from the leases themselves, or by inclusion in units created by the Commissioner of Conservation for the State of Louisiana, and by drilling on or production from those units, since the primary term of the leases in 1974 through the present date. Amber realleged that the 2005 Lease clouds its title to the Property as to its rights below 6,000 feet.

Amber further asserted that Marathon was holding in suspense $350,318.67, the amount attributable to "all lease burdens excluding the lessor's royalty up to 1/8 interest" as to that unit identified by Office of Conservation Order No. 104-G-53 known as the HA RE SUFF. Specifically, Amber alleged that the amount in suspense had been generated by production from three specific wells that are the subject of this litigation, the W. Simms et al No. 1 well, Serial No. 233300; the W. Simms et al No. 2-

5

Alt well, Serial No. 235057; and, the W. Simms et al No. 3 well, Serial No. 235554.[3]

Amber further alleged that it and Marathon had entered into a Farmin Agreement on July 26, 2006, covering the Property, which provided, *inter alia*, that Marathon would, on or before September 1, 2006, commence operations for the drilling of a test well on the Property, to be drilled to an approximate depth of 11,500 feet, adequate to test the Haynesville formation. All costs and expenses incurred or arising out of the drilling, testing, completing, equipping, or plugging and abandoning of the initial well were to be borne solely by Marathon.

In the event the test well was completed as a well capable of producing oil, gas, or other hydrocarbons in paying quantities, Marathon was to earn an assignment of all of Amber's right, title, and interest in and to the 1974 and 1975 Leases, to the extent they cover lands included in the drilling and spacing unit for the test well and insofar as they cover the depth interval from the surface of the ground down to 100 feet below total depth drilled, less and except that formation associated with the 8900 Cotton Valley, Reservoir A, Sand Unit D, North Shongaloo-Red Rock Field. Amber was to except and reserve from that assignment a proportionate overriding royalty equal to the difference between existing lease burdens and 25%, which, at payout, Amber had the election to either (1) convert the overriding royalty reserved to an undivided 25% interest in the leases, or (2) escalate the overriding royalty reserved an additional 5%, proportionately reduced.

---

[3] The wells are more properly identified as HA RE SUFF; L W Simms et al; No. 1, Serial No. 233320; HA RE SUFF; L W Simms et al No. 2-Alt, Serial No. 235057; and, the L W Simms et al; No. 3-Alt, Serial No. 235554.

Amber alleged that Marathon breached the Farmin Agreement by failing to pay the overriding royalty interest due Amber and otherwise recognize Amber's ownership and rights therein. Therefore, Amber asserted that it was entitled to a judgment rescinding and dissolving the Farmin Agreement, and recognizing that Amber's ownership of the 1974 and 1975 Leases as to the HA RE SUFF unit and production therefrom was not subject to the Farmin Agreement with Marathon.

Further, in connection with the declaration that the Farmin Agreement was void, Amber sought an accounting by Marathon for all production attributable to the 1974 and 1975 Leases from the producing depths of the HA RE SUFF from date of first production based on Amber having 100% working interest.

In the alternative, Amber re-urged its original claim, for a declaratory judgment that the 1974 and 1975 Leases were valid as to rights below 6000 feet as to the Property and that rights claimed by Welsh (and now Marathon) as to the Property and as to depths below 6,000 feet be declared null and void.

In early 2014, Amber filed a second supplemental and amending petition for declaratory judgment, naming as additional defendants Mary Simms Thomas, Lilla Sims Benefield, William L. Simms, and Cynthia Simms Wedgeworth, the children of William P. and Lilla White Simms (the "Simms family"). Amber sought judgment in its favor and against Welsh, Marathon, and the Simms family declaring the 1974 and 1975 Leases valid as to rights below 6,000 feet as to the Property and in its favor and against Welsh, Marathon, and the Simms family declaring rights claimed by Welsh and Marathon as to the Property regarding rights below 6,000 feet be

7

declared null and void. Amber reiterated the alternative declaratory relief sought against Marathon in its first supplemental and amending petition.

Amber's third supplemental and amending petition for declaratory judgment was filed in 2017, adding Blackbeard Operating East, LLC ("Blackbeard"), as a defendant. According to Amber, Marathon assigned its rights in the 2005 Lease to Blackbeard, thus making it the correct defendant. Amber further alleged that the W. Simms et al No. 1 well, Serial No. 233300 had reached payout as defined in the Farmin Agreement, that Marathon and/or Blackbeard owed Amber the option to convert the working interest or escalate the overriding royalty interest, and that the amount held in suspense by Marathon did not include or provide for Amber's additional rights to proceeds after payout. Amber reiterated its claims made in prior petitions, and asked that Marathon and Blackbeard[4] be ordered to make an accounting to Amber for all production attributable to the 1974 and 1975 Leases from the HA RE SUFF and the three unit wells, from the date of first production.

On June 9, 2019, Amber filed a motion for summary judgment, seeking recognition that the 1975 Lease is valid as to the Property, specifically as to the lease rights at 6,000 feet and below, and nullification of defendants' claims as to the validity of any other mineral lease. Defendants opposed that motion, arguing that the 1975 Lease, as to depths above 10,000 feet from the surface, was only a top lease that never came into effect, since the 1974 Lease was maintained by production shallower than 10,000 feet, and as there was no well drilled on the Property or lands with which it was

---

[4] Effective September 20, 2018, Blackbeard conveyed its interest in the 2005 Lease to Urban Oil & Gas Partners C-1, LP and Urban Fund III, LP by Assignment, Conveyance and Bill of Sale.

8

pooled within the term of the 1975 Lease as to depths below 10,000 feet (actually until 1992, well beyond the term of the 1975 Lease), it expired at the end of its five-year primary term.

Defendants filed a joint cross-motion for summary judgment on August 16, 2019, seeking a judgment declaring the validity of the 2005 Lease and dismissing Amber's claims and demands with prejudice at Amber's cost.

The trial court rendered judgment denying Amber's summary judgment motion, granting the joint cross-motion for summary judgment filed by defendants, and dismissing with prejudice all of Amber's claims, specifically decreeing that:

> [T]he January 29, 1974 Oil, Gas and Mineral Lease granted by Simms, … to cover depths from the surface to 10,000 feet below the surface was held by production beyond its primary term and the April 28, 1975 Oil, Gas and Mineral Lease granted by Simms, … expired at the end of its primary term on April 28, 1980. Thus, the October 28, 2005 Oil, Gas and Mineral Lease granted by Simms to Welsh, … is valid … as to depths below 10,000 feet subsurface.

It is from this judgment that Amber appeals.

## DISCUSSION

Amber asserts that the trial court erred in granting defendants' motion for summary judgment and denying its summary judgment motion. Amber also assigns as error the findings upon which the trial court based its judgment. Specifically, that the 1974 Lease, as amended, was held by production beyond its three-year term by the declared unit well; the 1975 Lease expired at the end of its five-year primary term; and, the 1975 Lease covered only depths below 10,000 subsurface.

9

In taking issue with the trial court's finding regarding its own 1974 Lease, Amber has abandoned the position it took from 2008 until 2019, that the 2005 Lease was a cloud on both the 1974 and 1975 Leases.[5] Instead, Amber argues that the 1975 Lease was a "stand-alone" lease, not a novation or a top lease of the 1974 Lease, which was maintained by declared unit well production and established during the five-year primary term of the 1975 Lease. Amber further asserts that the trial court erred in finding that the 1975 Lease covered only depths below 10,000 feet subsurface since, within its four corners, the lease had no depth limitations or restrictions.

Defendants urge this Court to affirm the trial court's judgment granting their motion for summary judgment and denying Amber's summary judgment motion. According to defendants, although never stated directly in any of its pleadings, what Amber seeks is a declaration that the 1975 Lease is valid as to **all depths** and has been maintained to the present time, such that it would be the operative lease for recent production from the Haynesville Shale.

For this to be the case, Amber took the position that the 1975 Lease **replaced** (although not by novation, which defendants contend is the only legal theory that could—although not under the facts of this case—support Amber's claim) the earlier recorded 1974 Lease which covered depths from the surface down to 10,000 feet. The trial court considered the applicable legal principles and evidence presented by the parties in support of and in opposition to their motions for summary judgment and correctly found that

---

[5] From the time Amber filed its initial pleading in 2008 until the filing of its motion for summary judgment in 2019, Amber had continuously asserted that both the 1974 Lease and the 1975 Lease were valid as to the Property and as to depths below 6,000 feet from the surface.

the *only* production during the primary five-year term of the 1975 Lease occurred as to depths of *less than* 10,000 feet, but that these depths were covered by the previously executed and recorded 1974 Lease, and that therefore, the 1975 expired at the end of its term in 1980.

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. La. C.C.P. art. 966; *Murphy v. Savannah*, 2018-0991 (La. 5/08/19), 282 So. 3d 1034; *Beer Industry League of Louisiana v. City of New Orleans*, 2018-0280 (La. 6/27/18), 251 So. 3d 380; *Duncan v. U.S.A.A. Ins. Co.*, 2006-363 (La. 11/29/06), 950 So. 2d 544. The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of civil actions (with the exception of certain domestic matters) and is favored in our law and shall be construed to accomplish those ends. La. C.C.P. art. 966(A)(2); *Murphy, supra*.

When a case involves cross motions for summary judgment, the court should consider whether either party has established that there is no genuine issue as to material fact and that it is entitled to judgment as a matter of law. *Gray v. American National Property Cas. Co.*, 2007-1670 (La. 2/26/08), 977 So. 2d 839; *Wart v. Progressive Security Ins. Co.*, 43,954 (La. App. 2 Cir. 4/8/09), 7 So. 3d 865, *writ denied*, 2009-1058 (La. 9/4/09), 17 So. 3d 963; *Dixon v. Direct General Ins. Co. of Louisiana*, 2008-0907 (La. App. 1 Cir. 3/27/09), 12 So. 3d 357.

Appellate courts review motions for summary judgment *de novo*, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of

11

law.  *Davis v. A Bar and Grill with a Bite, Inc.*, 2019-1928 (La. 3/16/20), 294 So. 3d 1051; *Guidry v. Brookshire Grocery Co.*, 2019-1999 (La. 2/26/20), 289 So. 3d 1026; *Murphy, supra*; *Wright v. Louisiana Power & Light*, 2006-1181 (La. 3/9/07), 951 So. 2d 1058.

The interpretation of a contract typically presents a question of law that may be resolved by summary judgment.  *Guy v. Empress, L.L.C.*, 50,404 (La. App. 2 Cir. 4/8/16), 193 So. 3d 177; *Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.*, 46,153 (La. App. 2 Cir. 3/23/11), 63 So. 3d 159, *writs denied*, 2011-1225, 1236 (La. 9/23/11), 69 So. 3d 1161, 1162; *Stephenson v. Petrohawk Properties*, *L.P.*, 45,296 (La. App. 2 Cir. 6/2/10), 37 So. 3d 1145.

A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals in consideration of the payment of a rental or bonus.  La. R.S. 31:114; *Odom v. Union Producing Co.*, 243 La. 48, 141 So. 2d 649 (La. 1961); *Guy, supra; Ross v. Enervest Operating, L.L.C.*, 48,229 (La. App. 2 Cir. 6/26/13), 119 So. 3d 943, *writ denied*, 2013-2034 (La. 11/15/13), 125 So. 3d 1110.  Like contracts in general, a mineral lease is the law between the parties and regulates their respective rights and obligations.  La. C.C. art. 1983; *Ross, supra; Pilkinton v. Ashley Ann Energy, L.L.C.*, 46,650 (La. App. 2 Cir. 11/2/11), 77 So. 3d 465, *writ denied*, 2011-2657 (La. 2/10/12), 80 So. 3d 484; *Stephenson*, *supra; Winnon v. Davis*, 32,988 (La. App. 2 Cir. 5/15/00), 759 So. 2d 321.

Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases.  C.C. art. 2672; La. R.S. 31:2, 31:114, et seq.; *Guy, supra; Ross, supra; Winnon, supra*. When the words of a mineral lease are clear

12

and explicit and do not lead to absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046; *Caskey v. Kelly Oil Co.*, 98-1193 (La. 6/29/99), 737 So. 2d 1257; *Questar Exploration and Production Co. v. Woodard Villa, Inc.*, 48,401 (La. App. 2 Cir. 8/7/13), 123 So. 3d 734, *writ denied*, 2013-2467 (La. 2/21/14), 133 So. 3d 682; *Pilkinton, supra.*

Top leases are granted by landowners during the existence of another mineral lease that become effective if and when the existing lease expires or is terminated. *Barham v. St. Mary Land & Exploration Co.*, 48,603 (La. App. 2 Cir. 11/20/13), 129 So. 3d 705, *writ denied*, 2013-2943 (La. 2/21/14), 134 So. 3d 586; *Pilkinton*, 77 So. 3d at 470, citing *Mobil Oil Exploration and Producing Southeast, Inc. v. Latham*, 44,996 (La. App. 2 Cir. 2/3/10), 31 So. 3d 1149. As a legal right, the top lease exists at its inception as a mere hope or expectancy in the extinction of existing superior leasehold rights, which extinction will confer upon the top lease owner the essence of a mineral lease, i.e., the right to explore for and produce minerals. *Pilkinton, supra*, citing Patrick G. Tracy, Jr., *The Effects of Top Leasing in the Louisiana Law of Oil and Gas*, 43 La. L. Rev. 1189, 1190 (1983).

The same lessee or his successor in title may secure a second lease from the same lessor covering all or part of the same interest before the first lease has expired. *Barham*, 129 So. 3d at 710. This "same party" top lease functions as one of several devices available to an operator to preserve leasehold rights in a situation where, for example, he is doubtful about the validity of a former lease. *Id.* at 710-11, citing Patrick Tracy, *supra* at 1190. Tracy goes on to write, 43 La. L. Rev. at 1193, that the mere execution of a top lease in favor of the same lessee will not of itself result in novation under

13

Louisiana law, and the language of the instrument itself is but one of several factors to consider in finding an intent to novate, unless the novation of the original lease agreement is expressly stipulated in clear and unmistakable terms. If, however, the common purpose of top leasing in that situation is protection, the mere execution of a top lease, silent as to its effect on the existing lease, should not result in the extinction of the original lease by novation. *Id.*

As urged by defendants in their briefs, in order for Amber to prevail, it has the burden of proving that the 1974 Lease was superseded and replaced by the 1975 Lease. While Amber has insisted that the 1975 Lease is a "stand alone, replacement" lease, this Court has found no legal authority to support such a theory. For the 1975 Lease to be a "replacement" lease for the 1974 Lease, novation would have had to occur, i.e., the 1975 Lease was substituted for the 1974 Lease. Plaintiff itself is not arguing novation, and for the reasons set forth below, we find that there is no evidence that a novation was intended by the parties to these leases. Instead, what the evidence shows is that the 1975 Lease, in relation to the 1974 Lease, was meant to function as a protective top lease. Otherwise, as to the Property, the 1975 Lease was limited to those depths ***not already specifically*** covered by the 1974 Lease.

Neither of the parties to the 1974 and 1975 Leases, the Simmses or Machin, was available to testify regarding their intent in executing the transactions, most specifically the 1975 Lease. However, the surrounding circumstances show that, as noted above, part of the land covered by the 1975 Lease, the Property, had already been the subject of a lease between the same parties: The 1974 Lease, which, after amendment and ratification

14

dated April 14, 1975, and filed for registry the same date, ***provided explicitly that it covered only those depths between the surface of the earth and 10,000 feet below the surface of the earth***.  A second amendment, also executed on April 14, 1975, but filed for registry on April 18, 1975, altered paragraph 7 of the 1974 Lease to allow the lessee to pool the leased premises in an 80-acre unit for the production of oil.

Machin's Declaration of Unit, dated April 15, 1975, on July 29, 1975 in the Conveyance Records of Webster Parish, Louisiana, declared the Property and the adjacent Lot 2 to be in a single operating unit for the development and production of oil and casinghead gas.  Together the two tracts comprised nearly 80 acres. ***The Declaration of Unit specifically identified the 1974 Lease and its amendments*** (as well as the other lease between the parties on the adjacent tract).  On April 15, 1975, Machin received a permit to drill the W. P. Simms No. 2 well on Lot 2.  Production from this well, completed in the primary term of the 1974 Lease at a depth of less than 10,000 feet, held the 1974 Lease until the well (then named the PET RA SUHH) was included in the fieldwide unit, the NSRR PET RB SU.  Thereafter, production from the fieldwide unit held the 1974 Lease until production from the fieldwide unit ceased in December 1996.[6]

The 1975 Lease was executed as a top lease by Mr. and Mrs. Simms and Machin on April 28, 1975, 14 days after the 1974 Lease had been amended and 13 days after Machin had obtained the permit to drill the W. P. Simms No. 2, the well for the 80-acre voluntary unit created by Machin on

---

[6] The Property was included in the 8900 CV RA SUD, created by Order 104-R, effective March 2, 1995.  The unit well, the E. S. Jones No. 7, produced from March 1995 through August 2008.

April 15, 1975.  It was granted by the Simmses during the existence of another mineral lease (the 1974 Lease) with Machin and was to become effective as to the shallow depths (those depths between the surface of the earth and 10,000 feet below the surface of the earth) if and when the 1974 Lease expired or was terminated.[7]  The 1975 Lease existed at its inception as a mere hope or expectancy in the extinction of existing superior leasehold rights *in the shallow depths*.  However, the 1974 Lease neither expired nor terminated prior to the five-year primary term of the 1975 Lease.  Instead, according to Amber's second supplemental petition, the 1974 Lease has been maintained by drilling and production as to depths above 10,000 feet below the surface.  Therefore, the 1975 Lease *was never effective as to those depths*.  For the 1975 Lease to have survived beyond its primary term of five years, there had to be production from lands covered by the lease or lands pooled therewith at depths below 10,000 feet below the surface.  The evidence introduced by Amber and defendants establishes that there was no such production *prior to 1992*.  Thus, by its terms, as to depths below 10,000 feet from the surface, the 1975 Lease expired on April 28, 1980, because there was no production from those depths.

As set forth above, the evidence introduced by the parties supports that the conclusion that the 1975 Lease was not maintained beyond its primary term, and that the deep rights in the Property were not leased at the time the 2005 Lease was taken.  Furthermore, defendants established that, while the 2005 Lease, on its face, covers all depths below 6,000 feet below

---

[7] Having transferred their rights in these specified depths to Machin in the prior lease, there was no need for the Simmses to do so again in the 1975 Lease.  This is a basic tenet of Louisiana property law.  *See, Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 2010-2267 (La. 10/25/11), 79 So. 3d 246, 282, fn. 81.

16

the surface, it is effective only as to depths below 10,000 feet.  Because the wells in the HA RE SUFF were drilled to depths below 11,000 feet, the 2005 Lease has been maintained.

We find no error in the trial court's judgment denying plaintiff's judgment for summary judgment and granting defendants' joint cross-motion for summary judgment based on its findings that: the 1974 Lease, amended to cover depths from the surface to 10,000 feet below the surface, was held beyond its primary term by production; the 1975 Lease expired at the end of its primary term on April 28, 1980; and, the 2005 Lease is valid as to the Property as to depths below 10,000 feet subsurface.

## CONCLUSION

For the reasons set forth above, the judgment of the trial court is affirmed.  Costs of this appeal are assessed to plaintiff, Amber, LLC.

**AFFIRMED.**