PITMAN, J.
| plaintiffs, Arthur William Ross (“Bill”), Nicole A. Ross, James Boyd Holley and Susan Duncan Holley, owners of a 3/8 interest in land in Morehouse Parish, filed suit to cancel an oil, gas and mineral lease entered into by their ancestors in title prior to 1921, for nonpayment of amounts due under the lease since 1998. The trial judge granted judgment in their favor, cancelled the lease as to the 3/8 interest as of January 10, 1998, and ordered Defendants, Enervest Operating, LLC, Enervest Production Partners, LTD (collectively, “Enervest”), Devon Energy Production Company, LP (“Devon”), and Gas Masters of America, Inc. (“Gas Masters”), to provide an accounting to Plaintiffs of any gas or other mineral production from November 3, 1999, to the date of the judgment. Upon acceptance of the accounting, Defendants were to pay all monies due Plaintiffs within 30 days. For the following reasons, we reverse the judgment of the trial court and remand for further consideration in accordance with this opinion.

FACTS

Plaintiffs are owners of a 3/8 undivided interest in land in Sections 10, 11, 14, 15, 21, 22, 23, 24, 26, 27 and 28, Township 20 North, Range 4 East, Morehouse Parish, Louisiana, (hereafter, the “Sandidge property”). The Rosses inherited their interest from family members, and the Holleys purchased a portion of the property from the Rosses. The Holleys claim that, as a result of that purchase, they are entitled to ownership of 1/2 of all income derived from the production of minerals attributable to *946 the surface acreage owned by them and of that still owned by the Rosses.
IgThe Rosses’ ancestors in title entered into an oil, gas and mineral lease in 1916 (“Sandidge” lease) covering the Sandidge property and the lease was amended once in 1921 and again in 1935. Defendants are the four current lessees of the subject property. Enervest is alleged to be the current record owner of the lease as it pertains to strata from the base of the Arkadelphia Formation to the base of the Monroe Gas Rock Formation. Devon and Gas Masters are the current record owners of the lease as to all other strata. Gas Masters acquired its interest in the property in 1992 and is the company responsible for making all payments of royalties due under the lease.

The Leases:

The 1916 lease was amended in 1921 (“the 1921 Amendment”) and that amendment provided in part as follows:
The Lessee shall pay to the Lessors jointly the sum of Two Thousand Dollars ($2,000.00) for the gas and gas rights in the lands embraced in said lease for the year 1.20 [sic ] and Three Thousand Dollars ($3,000.00) for each subsequent year during the continuation of said lease; and all payments shall be made to the Bastrop State Bank of Bastrop, Louisiana as Trustee for the lessors.... and all payments shall be amde [sic ] annually in advance on or before the 10th day of January each year ...
[[Image here]]
... the said lease as to all of the rights of the lessee herein shall remain in full force and effect until January 10, 1922; and the said lease as to all of the rights of the Lessee herein shall remain in full force and effect continuously thereafter so long as the Lessee pays in the manner aforesaid the said sum of three thousand dollars ($3,000.00) on or before the 10th day of January each year; provided that if the Lessee should fail to make said payments annually as aforesaid all of his rights under said lease shall terminate; and the lands therein described shall revert to the Lessors free from any claims or demands or rights of the Lessee. The true intent and purpose being that the Lessee shall pay to the Lessors for all of the gas and gas rights [3in or under the lands embraced in said lease the sum of two thousand dollars ($2,000.00) for the year 1920 and the sum of three thousand dollars ($3,000.00) for each subsequent year-all future payments to be made on or before January 10 of each year beginning with the year 1922 as aforesaid; and that the failure of the Lessee to so make said payments shall ipso facto terminate all of his rights, title and interest to the gas and gas rights in or wider said lands; and the said lands, with all of the gas and gas rights, shall revert to the Lessors from ... any claims or demands or rights of ownership, interest or possession on the part of the lessee. (Emphasis added.)
The lease was again amended in 1935 (“the 1935 Amendment”), and that amendment provided in pertinent part as follows:
That the royalties and rentals and considerations provided in said lease as amended by said agreement with S.S. Hunter [referencing the original lease and the 1921 Amendment] for the gas and gas rights, shall no longer be effective but hereafter payments therefore should be made as follows:
1. Subject to the conditions hereinafter set out, the Lessee shall pay to the Bastrop Bank & Trust Company, as Trustee, for the joint account of the Lessors herein according to their respective interests in said described *947 lands, annually in advance on or before the 10th day of January, in each year, the sum of $3,000.00 ivhieh shall be a minimum yearly 'payment as herein provided.
2. Subject to the above minimum and the conditions herein contained, the Lessee shall pay to the Lessors a royalty of one-eighth of the value of the gas ... used or marketed from any well on said property at .03 cents per thousand cubic feet, ... payable as follows: The amount of said royalty shall be calculated at the end of each year ... and if the said royalty amounts to more than Three Thousand ($3,000.00) Dollars, the excess due to Lessors herein for the preceding accounting year shall be paid to them within thirty days after the tenth day of January on which the payment above set out is due....
3. It is further agreed that the said lease as heretofore and herein amended as to all other rights of the parties hereto shall remain in full force and effect in all their parts and clauses, except as to Lot Six ... and the other lands above excepted[ — ] (Emphasis added.)

14Oumership chain of title:

Bill acquired his initial interest in the land from his grandmother, Fannie Taylor, who resided at 203 W. Jefferson in Bas-trop, Louisiana. Ms. Taylor died in 1972, leaving three heirs, Bill, his sister, Nancy T. Ross, and their aunt and Ms. Taylor’s daughter, Nannie T. Winberry (“Winber-ry”). Winberry inherited 1/2 of Ms. Taylor’s interest in the property and Bill and Nancy Ross each inherited a 1/4 interest.
Winberry apparently had resided with Ms. Taylor at 203 W. Jefferson in Bastrop. When Ms. Taylor died in 1972, the lessee responsible for making payments due on the Sandidge lease sent a payment to the “Fannie Taylor Estate, c/o Nannie Win-berry” at the W. Jefferson address.
In 1991, Nancy Ross died and left her entire estate to her brother, Bill. In 1994, Winberry went to live with Bill and his wife, Nicole, at their home on Sullivan’s Island, South Carolina. Neither Winberry nor Bill sent any notification to Gas Masters that Nancy Ross had died (and that Bill had inherited her property) or that Winberry had moved from Bastrop to South Carolina.
Winberry subsequently died in 1998 and her succession was opened in Morehouse Parish, naming Bill and Nicole Ross as her sole heirs. The Rosses never sent any notification to Gas Masters that Winberry had died (and they had inherited her interest in the property).
Gas Masters acquired its interest in the Sandidge lease from Pennzoil in 1992. Pennzoil gave Gas Masters a “dec sheet,” which provided the names and addresses of the current owners of the interest. In regard to these ^particular plaintiffs, the dec sheet said the payment was to be sent to the Fannie Taylor Estate at the address on W. Jefferson in Bastrop. Although Bill and Nancy Ross were half owners of Fannie Taylor’s interest, the checks were made out to the Fannie Taylor Estate, c/o Nannie Winberry. The checks for 1994, 1995 and 1997 were received and cashed, even though they were sent to Bastrop and Winberry was living in South Carolina at the time. The checks for 1996 and 1998 were returned by the post office.
Gas Masters wrote a letter in May 1996 asking royalty owners if they knew of the whereabouts of other lessors. An attorney responded to Gas Masters in October 1996 and informed the company that some addresses of lessors could be found in the public records of Morehouse Parish, specifically in the succession of Fannie Taylor. Since Gas Masters already knew that Fan *948 nie Taylor was deceased, and they were looking for information regarding Nannie Winberry, the company made no attempt to find the addresses in the public records of Morehouse Parish.

The Litigation:

The Holleys, who were already landowners in the area of the subject property, bought part of the Sandidge land and minerals from the Rosses in 2008. Ms. Holley wrote a letter to Enervest stating that she and her husband had purchased property described in an attached acquisition deed and stated that any royalties/correspondence should be sent to her address. She also provided other contact information.
Although Enervest operates wells on the Sandidge property and surrounding areas, it does not issue royalty payments under the Sandidge | please and the Rosses were not on their list of royalty owners. Gas Masters is the entity responsible for issuing payments to royalty owners on the Sandidge lease. For that reason, Ener-vest, through its landman Ricky Collins, responded to the Holleys and advised them that, although it operated wells on the Sandidge property, the Rosses did not receive royalty payments from Enervest. Enervest provided the Holleys with information concerning the existence of multiple producing wells on the property.
On April 15, 2009, an attorney, Newman Trowbridge, sent a letter to Enervest Operating and Devon Energy notifying them of the claims of the Rosses, who were heirs of the interest of the Estate of Fannie Taylor. The purpose of the letter was to put Enervest and Devon on notice of the occurrence of a resolutory condition provided by the lease, resulting in termination of the lease. Alternatively, the letter was to place the companies on notice of “your failure to properly pay royalty to Ross under the Lease.” The letter further made demand upon them to comply with their obligations pursuant to the terms of the lease and Louisiana law within 30 days of receipt of the letter.
Trowbridge noted that Enervest, through Collins, had admitted operating wells on the property and listed them. Trowbridge also noted that a search of the records of the Louisiana Department of Conservation showed other wells that were operated by Enervest on the Sandidge property. Trowbridge stated that Ener-vest had failed to credit either William A. Ross or Nicole A. Ross with an interest in any of these wells and had failed to pay them either the minimum annual payment required by the 17lease or royalty attributable to their interest in the lease and that such failure constituted the occurrence of a resolutory condition resulting in the immediate termination of the lease. A demand was made that Enervest release the lease and account and pay to the Rosses 100% of the value of production attributable to their interests in the Sandidge property. An alternative demand was made based on the provisions of the Louisiana Mineral Code.
Enervest immediately provided Gas Masters with a copy of the Trowbridge letter. On May 12, 2009, Gas Masters responded to the letter, and stated that, from 1975 until 1995, the checks which had been sent to the Estate of Fannie Taylor, c/o Nannie Winberry, had been received and cashed. Gas Masters explained that, in certain years, it had attempted to pay the Estate of Fannie Taylor; but, because it had no accurate address, the checks were returned by the post' office. Gas Masters stated it had attempted to locate missing lessors, but no new address was provided for Nannie Winberry, and it had never been advised to pay any parties other than Winberry with respect to the Fannie Taylor royalties.
*949 Along with the May 12, 2009 correspondence, Gas Masters tendered to the Rosses the full amount of royalties attributable to their interests, plus all interest which was due and owing, without regard to the fact that some of the claims for royalties had prescribed. Gas Masters noted that the tendering of the full amount, without consideration of prescription, was made in an effort to amicably settle the dispute. The letter stated that Gas Masters expressly reserved all rights and defenses available to it, including ]sthe right to assert the defense of prescription, in the event the various parties were not able to resolve the matter amicably. Instead of accepting the payment, however, the Rosses and Holleys filed suit to cancel the lease pursuant to the ipso facto cancellation clause of the 1921 Amendment and sought an accounting and payment for amounts due.
At the trial of the matter, the Holleys testified that they purchased the land and mineral rights from the Rosses and that they realized the Rosses were not being paid for the minerals produced under the Sandidge lease. Boyd Holley testified that, as a farmer, he is very familiar with the fact that there were wells located on the property operated by Enervest. It was that knowledge which prompted his wife to contact Enervest in 2008 after they purchased their interest to attempt to learn what royalties had been paid to the Rosses.
Bill testified that he was never aware that Winberry was receiving a check for the Sandidge property from Gas Masters, even after she moved in with him and his wife in 1994.[1] When Winberry died in 1998 and he was named executor of her estate, he was still unaware that he was not being paid the royalties due under the lease, even though Winberry had received and negotiated checks from Gas Masters in 1994, 1995 and 1997. Bill claimed his confusion was caused by the fact that En-ervest was sending him a check for gas produced from other tracts called the Keno and Patton | ¡(Tracts, and he was unaware that he was supposed to receive royalty payments from Gas Masters for the Sandidge property.
Ricky Collins (Enervest landman) testified that Enervest acquired its interest in the Sandidge property in two stages. It acquired an interest from Roy Teal in 1986 and from Gas Masters in 2000. Gas Masters kept an override and was responsible for paying royalties to the Sandidge lessors. Collins testified that Enervest pays 85% of the $3,000 owed to the lessors annually; and, if any additional money was owed, Gas Masters would have invoiced Enervest. Collins was asked to review the list of wells from which the Rosses were to receive royalty payments, and he testified that Enervest paid royalties on those wells for which it was responsible, but not on those for which Gas Masters was responsible. Collins also stated that it was customary in the mineral industry for lessors to inform the lessees of any changes in ownership so that payments could be made to the proper persons.
Joseph Jacobs, owner of Gas Masters, testified that his company had acquired its interest in the Sandidge lease in 1992 from Pennzoil. He testified that Gas Masters makes money from an override on the lease and that his company was responsible for payment of the royalties due under the lease. Jacobs stated that Gas Masters sent payments to Winberry in 1994 and *950 1995 without any problem. However, the payment for 1996 mailed to the Fannie Taylor Estate, c/o Nannie Winberry, in Bastrop, was returned.
Jacobs testified that Gas Masters does make an effort to locate missing owners, but that it is usually incumbent upon owners to contact the company to inform them about changes in ownership due to death and 1 ^inheritance, simple changes of address or sale of rights. He stated that one of his employees sent out a letter to other lessors inquiring if anyone knew of the whereabouts of the Fannie Taylor heirs. Jacobs testified that, when Gas Masters received the letter from an attorney suggesting that it look in the records of More-house Parish, and particularly the succession of Fannie Taylor, it did not follow the suggestion because the person it was seeking to locate was Nannie Winberry and it did not believe that examining the succession proceeding of Fannie Taylor would provide them with an address for Winber-ry. Thereafter, the 1997 payment written to the estate, c/o Winberry, and mailed to the address in Bastrop was negotiated. However, the payment for 1998 was returned and Gas Masters simply put the check in a file and noted that the address was unknown.
Jacobs further testified that Gas Masters’ records indicate that the Fannie Taylor Estate was owed minimum royalties each year and that the address to which the royalties were to be sent was unknown. The payment for 2000 was in a file at the corporate office; but, other than that check, no others were available. Jacobs testified that they stopped writing the checks, but noted in the file that the money was owed. He further stated that Gas Masters never heard from Winberry or any of the persons claiming an interest in the Fannie Taylor Estate.
Jacobs also testified that the $3,000 payment made in January of each year was payment in advance for the gas produced on the lease and that, if gas production exceeded that payment, there would be an end-of-the-year accounting to determine the additional amount owed. However, production |1Tfrom these wells in the field never exceeded a value of $3,000 and payment of additional royalties was never required. All the other lessors of this lease have been paid the monies due them.
Jacobs testified he did not receive a copy of the letter the Holleys wrote to Enervest until after litigation was instituted. He also testified that he did not receive the Trowbridge letter at Gas Masters from the Rosses until it was sent to him by Enervest and Devon after they received it. He stated that Gas Masters responded immediately to the Rosses and tendered the full amount of royalties due plus interest, but the Rosses rejected it.
The trial court issued detailed reasons for judgment and stated that multiple issues and various theories were presented at trial, both supporting and refuting termination of the lease. The trial court found that the $3,000 minimal payment required in the 1935 Amendment to the lease was “primarily a rental/lease payment” as the money was due lessors regardless of the amount of gas production. The trial court noted that never, over the course of nearly 100 years, did the gas production exceed the minimum amount and that Plaintiffs’ ancestors in title received the $3,000 regardless of whether or not there was any gas production. Since the payment was rent, the ipso facto termination clause found in the 1921 Amendment applied, rather than the provisions of the Louisiana Mineral Code, and created a resolutory condition, which, if not met, resulted in the automatic termination of the lease.
*951 The trial court determined that Defendants had not paid the $3,000 minimum payment to Plaintiffs in accordance with the lease agreement and |12that it was Defendants’ duty to locate the missing lessors, rather than that of Plaintiffs to determine their own mineral interests and then notify Defendants that they were the proper payees under the lease.
The trial court found that Defendants did not intentionally or fraudulently withhold the monies from Plaintiffs, but noted that Defendants were aware of the identity of the Rosses in excess of 30 days before they attempted to tender payment for the unpaid years, which could provide an alternative basis to terminate the lease. In making this finding, the trial court noted that the Holleys had provided written notice on July 7, 2008, to Enervest advising that they had just acquired certain mineral interests in a deed from the Rosses. The trial court indicated that it considered that letter a request by the Holleys that all applicable royalties be forwarded to them.
For those reasons, the trial court granted judgment in Plaintiffs’ favor, cancelled the lease as to their interest, ordered Defendants to provide them with an accounting of funds due under the lease from 1998 to the present and to pay the money due after Plaintiffs’ acceptance of the accounting. Defendants now appeal.

DISCUSSION

Gas Masters’ brief raised 4 assignments of error. Enervest’s and Devon’s brief raised 12 assignments of error. The assignments of error have been consolidated in this opinion for purposes of discussion and resolution.

Royalty or rent

Defendants contend that the trial court erred in finding that the $3,000 minimum yearly payment is a rental payment rather than a royalty | ispaid on production or constructive production. They argue that the trial court’s erroneous conclusion has a significant impact on the rest of the ease because the characterization of the payment as rent, rather than royalty, allows the lessors to seek immediate cancellation of the lease pursuant to the ipso facto clause in the 1921 Amendment and to ignore the provisions of the Louisiana Mineral Code, which requires them to place the lessees in default prior to seeking cancellation of the lease. Defendants argue that the payments were royalties; and, thus, Plaintiffs are not entitled to the relief they seek because Defendants properly complied with the applicable provisions of the Louisiana Mineral Code regarding unpaid royalties.
Defendants argue that the characterization of the payment as rent was legally incorrect because there was no evidence presented that there was ever a year in which there was no gas production on the leased property. Defendants point out that the Louisiana Mineral Code prohibits, as a matter of public policy, any provision in a lease which allows a lease to be maintained for more than ten years without production or operations. They argue that, under the conclusion reached by the trial court, Defendants could make the $3,000 “rental” payment annually without ever having to produce the property, but such action is specifically proscribed by Louisiana law.
Defendants also argue that the trial court ignored the definitions of the three types of payments which apply to oil, gas and mineral leases under the Louisiana Mineral Code, i.e., bonus, rental and royalty. Defendants claim that “rental” is defined as “money or other property given to maintain a mineral lease in the absence of drilling or mining operations or production | Mof minerals.” “Royalty” is defined as “any interest in production, or its value *952 from or attributable to land subject to a mineral lease, that is deliverable or payable to the lessor or others entitled to share therein.” La. R.S. 31:213(4),(5). Defendants argue that the $3,000 annual royalty payment cannot be considered “rental” since it was not paid in the absence of drilling or mining operations or production of minerals.
Defendants also argue that “royalty” includes an interest in production classified as “constructive production.” Defendants argue that, under the terms of the lease, from 1935 to the present day, the $3,000 annual minimum royalty payment has been treated as a royalty and referred to as a royalty by all parties. Defendants contend that the only logical reading of the lease compels the conclusion that the $3,000 payment is royalty and not rent; and, as such, the mandatory provisions of the Louisiana Mineral Code apply, whereby the lessors were required to make a legal demand when seeking relief from lessees for failure to make timely or proper payment of royalties.
Plaintiffs contend that the trial court correctly found that the $3,000 annual payment is rent, thus making the resolution of the rest of the litigation dependent on contractual interpretation of the lease alone and negating the need to consider the provisions of the Louisiana Mineral Code or the Louisiana Civil Code. Plaintiffs argue that it matters not that all the lessors referred to the annual payment as a royalty instead of as a rent. Plaintiffs claim that a reading of the 1921 Amendment provides for an “annual payment” which is to be supplemented with the 1/8 royalty, and that ] 1Bthis method of payment due them was restated in the 1935 Amendment. Plaintiffs contend that the language of the lease is clear; therefore, there is no need of interpretation to determine the parties’ intent.
Where one or more trial court legal errors interdict the fact-finding process, the “manifest error” standard is no longer applicable; and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine the preponderance of the evidence. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731.
The definitions of terms in the Louisiana Mineral Code are found at La. R.S. 31:213. Rental and royalty are defined as follows:
(4) “Rental” means money or other property given to maintain a mineral lease in the absence of drilling or mining operations or production of minerals. “Rental” does not include payments classified by a lease as constructive production.
[[Image here]]
(5) “Royalty,” as used in connection with mineral leases, means any interest in production, or its value, from or attributable to land subject to a mineral lease, that is deliverable or payable to the lessor or others entitled to share therein. Such interests in production or its value are “royalty,” whether created by the lease or by separate instrument, if they comprise a part of the negotiated agreement resulting in execution of the lease. “Royalty” also includes sums payable to the lessor that are classified by the lease as constructive production.
La. R.S. 31:115 concerns the terms of a lease and continuation of the lease and states in pertinent part as follows:
A. The interest of a mineral lessee is not subject to the prescription of non-use, but the lease must have a term. Except as provided in this Article, a lease shall not be continued for a *953 11fiperiod of more than ten years without drilling or mining operations or production. Except as provided in this Article, if a mineral lease permits continuance for a period greater than ten years without drilling or mining operations or production, the period is reduced to ten years.
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals in consideration of the payment of a rental or bonus. La. R.S. 31:114; Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649 (La.1961). Like contracts in general, a mineral lease is the law between the parties and regulates their respective rights and obligations. Winnon v. Davis, 32,988 (La.App.2d Cir.5/15/00), 759 So.2d 321. The general rules of contract interpretation apply when interpreting contracts involving mineral rights. Blanchard v. Pan-OK Prod. Co. Inc., 32,764 (La.App.2d Cir.4/5/00), 755 So.2d 376, writ denied, 00-1297 (La.6/23/00), 765 So.2d 1043. Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145.
 The determination of whether a contract is clear or ambiguous is also a matter of law. Stephenson, supra. Ambiguity exists as to the parties’ intent when the contract lacks a provision on the issue or when the language of the contract is uncertain or fairly susceptible to more than one interpretation. Id.
The purpose of contract interpretation is to determine the common intent of the parties. La. C.C. art.2045. The words used in a contract are to be given their generally prevailing meaning unless they are words of art or have acquired a technical meaning. La. C.C. art.2047. When the words of a contract are clear, explicit and lead to no absurd consequences, then no |17further interpretation may be made in search of the parties’ intent. La. C.C. art.2046. When the words of a contract are susceptible of different meanings, they must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art.2048. A provision that is susceptible of different meanings must be interpreted so that it is rendered effective. La. C.C. art.2049. Moreover, each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050. Finally, if doubt arises from lack of a necessary explanation that one party should have given, the contract must be interpreted in a manner favorable to the other party. La. C.C. art.2057.
The trial court determined that, although the annual $3,000 payment due under the terms of the lease “may have some royalty component, it is more properly described as a rental/lease payment rather than a royalty payment.” We disagree with this conclusion. Although the evidence presented showed that production from the Sandidge lease never exceeded the minimum value of $3,000 per year such that the additional 1/8 royalty ever had to be paid, the annual payment was precisely for gas production on the land and, under the law, is a royalty payment.
The very definition of “royalty” is any interest in production, or its value, from or attributable to land subject to a mineral lease, that is deliverable or payable to the lessor or others entitled to share therein. Gas has been produced from this property for the life of the lease. Testimony was introduced that all other known landowners were paid in a timely |TSfashion over the years. For these reasons, we find that the $3,000 annual payment was a royalty payment, and not rent or a rental payment. Therefore, the assignments of error related to this issue have merit.

*954
The ipso facto termination clause

In finding that the ipso facto termination clause applied, the trial court cited La. R.S. 31:133 and stated that a mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition. The trial court found that the ipso facto clause survived the 1935 Amendment to the lease in full force and effect. The trial court further found that nonpayment of the monies due on January 10 of each year resulted in the resolutory condition which terminated the mineral lease. This finding was based on the trial court’s determination that the main purpose of the 1935 Amendment “when read in its entirety and with the payment provision of the original lease and the 1921 amendment, was to add the l/8th royalty provision, not to eliminate the termination provision.” The trial court also found that, had it been the intent of the parties to eliminate the right available to the lessors, such language would have been explicitly set forth in the 1935 Amendment. Since the amendment included language that all other rights of the parties should remain in full force and effect in all their parts and clauses, the ipso facto clause was deemed to survive the later amendment.
Defendants argue that the 1935 Amendment to the lease eliminated the ipso facto clause that was first introduced in the 1921 Amendment. Defendants claim the purpose of the 1921 Amendment was twofold: 1) to 1 ^compromise the issue relative to the royalty for wells producing gas and 2) to correctly set forth the description of lands covered by the lease. They contend that the royalty amount provided in the 1921 Amendment was an annual non-adjustable payment, not a minimum that could be adjusted by high production volumes. The royalty payment established at that time could not increase or decrease according to production volumes. For that reason, the parties provided that the failure to make this annual, non-adjustable, fixed payment, would, ipso facto, terminate the lease. The payment was referred to as a royalty in the 1921 Amendment.
Defendants argue that the 1935 Amendment established an annual, advance minimum royalty payment due in January, plus an excess royalty payment if gas production for the year exceeded the minimum payment. Defendants contend that the 1935 Amendment intentionally omitted the ipso facto clause originally contained in the 1921 Amendment and, further, that it replaced the fixed, non-adjustable royalty of the 1921 Amendment with a guaranteed minimum royalty, which would be increased if production volumes necessitated a higher payment.
Defendants further argue that the language of the 1935 Amendment specifically states that the “royalties and rentals and considerations” provided in the 1916 lease and the 1921 Amendment “shall no longer be effective.” Further, the 1935 Amendment provides that, “subject to the conditions hereinafter set out,” the $3,000 payment was to be paid on or before January 10 of each year. Defendants contend that the conditions that 12nare “hereinafter set out” include no reference to the 1921 Amendment or to the ipso facto clause or to any other resolutory condition.
Plaintiffs argue that the ipso facto clause was incorporated by reference in the 1935 Amendment because it contained the provision that the lease, “as heretofore and herein amended as to all other rights of the parties hereto shall remain in full force and effect in all of their parts and clauses.” This, Plaintiffs claim, incorporated the clause which called for immediate termination of the lease upon lessees’ failure to timely and properly pay the monies due them on January 10 of each year. *955 Plaintiffs also argue that this is a common practice and requiring parties to restate all the terms of a previous contract rather than simply incorporating them by reference would be unduly burdensome and is not required by the law.
La. R.S. 31:3 states:
Unless expressly or impliedly prohibited from doing so, individuals may renounce or modify what is established in their favor by the provisions of this Code if the renunciation or modification does not affect the rights of others and is not contrary to the public good.
La. R.S. 31:133 states that a mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition. If a mineral lease is violated, an aggrieved party is entitled to any appropriate relief provided by law. La. R.S. 31:134. The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases, subject to certain modifications. La. R.S. 31:135. If a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he must give his lessee written |⅞1 notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease. La. R.S. 31:137.
In Stream Family Ltd. Partnership v. Marathon Oil Co., 09-561 (La.App. 3d Cir.12/23/09), 27 So.3d 354, writ denied, 10-0196 (La.4/16/10), 31 So.3d 1064, the express resolutory condition found in the lease at issue provided:
Except in instances of willfully or persistently late or improper payment LESSOR shall give twenty-one (21) days written notice of LESSEE’S failure to make timely or proper payment of royalties as a prerequisite to a successful judicial demand for dissolution of the lease. In the instance of willfully or persistently late or improper payment, LESSOR need not give such notice and the lease shall resolve immediately. (Emphasis added.)
The trial court found that lessee’s failure to make royalty payments triggered the express resolutory condition in the lease; thus, there was no need to seek judicial demand for dissolution under La. R.S. 31:137. The third circuit found no error with that conclusion.
In affirming the trial court in Stream Family, supra, the court distinguished its decision in Acquisitions, Inc. v. Frontier Explorations, Inc., 432 So.2d 1095 (La.App. 3d Cir.1983). In Acquisitions, the shut-in provision at issue did not contain an express resolutory condition. In analyzing La. R.S. 31:133 and 31:137, the Acquisitions court noted, “whether the remedy of cancellation is available without a putting in default depends upon the terms of the lease.” Since the lease in Acquisitions did not contain an express resolutory condition, that court found the written notice requirement of La. R.S. 31:137 to be applicable.
_|_2jThe royalty payment provisions of the 1921 Amendment plainly state that the intent and purpose are that the lessee should pay $3,000 on or before January 10 of each subsequent year and that the failure of the lessee to make payments shall ipso facto terminate all of his rights, title and interest to the gas and gas rights of the lease. Thus, the ipso facto termination clause specifically stated the consequences for nonpayment of the royalty.
Language in the 1935 Amendment states:
[T]he royalties and rentals and considerations provided in said lease as amended by said agreement with S.S. Hunter [referencing the original lease and the 1921 Amendment] for the gas and gas rights, shall no longer be effective but *956 hereafter payments therefore should be made as follows:[ — ]
Thereafter, in Paragraphs 1 and 2, the amendment states the following: 1) the requirement that the lessee pay the lessors the $3,000 payment on or before January 10 of each year; and 2) an additional 1/8 royalty if production exceeds the value of $3,000. Neither paragraph contains any provision regarding the consequences for lessee’s failure to make the payments in a timely manner as did the 1921 Amendment. Paragraph 3 states that, “the said lease as heretofore and herein amended as to all other rights of the parties hereto shall remain in full force and effect in all their parts and clauses.”
The determination of whether a contract is clear or ambiguous is a matter of law. Ambiguity exists as to the parties’ intent when a contract lacks a provision on the issue or when the language of the contract is | ^uncertain or fairly susceptible to more than one interpretation. This is the situation in the case at bar.
Based on the language of the 1921 and 1935 Amendments to the lease, we find that the ipso facto termination clause, which was not specifically restated in that portion of the 1935 Amendment regarding royalty payments, was not incorporated by reference. For this reason, the assignments of error related to the automatic termination of the lease pursuant to the ipso facto clause have merit.

Was nonpayment of royalties reasonable under the circumstances

After the trial court’s finding that the lease payments were rentals rather than royalties and that the termination clause was still in effect, it determined that it had discretion to cancel the lease if it found that the failure to pay was fraudulent. In making this determination, the trial court stated the right to dissolve a mineral lease is subject to judicial control according to the factual circumstances of each case. The trial court specifically found that there was no evidence to show that Defendants’ nonpayment was in any way intentional or fraudulent.
The trial court also determined that the ultimate inquiry was whether it was Plaintiffs’ duty to determine their own mineral interest and notify Defendants that they were the proper payees under the lease, or whether it was Defendants’ duty to ascertain and locate the proper payees. The trial court applied a reasonableness standard based on the facts and circumstances of the case and found that a simple search by Defendants in 1996 of the probate records of Morehouse Parish for the heirs of Fannie | ^Taylor, and again in 1998 for the heirs of Winberry, would have revealed Bill’s mailing address in South Carolina. The trial court stated that these were all readily available public records and the necessary information to make proper payments would have been easily discernible with just a cursory review. For these reasons, the trial court concluded that it was not unreasonable to place the burden on Defendants to avoid potential problems with payments by performing a cursory search of the succession records, which they had been advised existed, or to request from lessors a list of heirship.
Defendants argue that, after finding that the ipso facto termination clause was still applicable, the trial court erred in finding that they were at fault for their inability to fulfill their obligation. Defendants contend that an obligee of a conditional obligation, pending fulfillment of the condition, may take all lawful measures to preserve his right. Defendants argue that a condition is regarded as fulfilled when it is not fulfilled due to the fault of a party with an interest contrary to the fulfillment. Defendants point out that they were unable to make the January 10 payment each *957 year because Winberry failed to inform them of her address change to South Carolina and Bill failed to inform them of the changes in ownership resulting from the deaths of Winberry and Nancy Ross.
Defendants argue that, in the absence of a contrary agreement, usage or custom, rent is payable at the address provided by the lessor or, in the absence thereof, at the address of the lessee. Since Defendants had only the Bastrop address for payments, when that address became obsolete, through |j.fino fault of theirs, the monies owed to the heirs of Fannie Taylor were reserved at the office of Gas Masters until it was notified of the payees’ correct address.
Plaintiffs argued that the lessees owed a duty to perform their lease obligations in good faith. Plaintiffs claimed that the record shows that Enervest was already paying them for gas produced on other property in the area, and Gas Masters could have asked Enervest if it was aware of the location of the Ross Plaintiffs or could have researched the Morehouse Parish probate records as suggested by the trial court.
In addition to the rules of contract interpretation already discussed, La. C.C. art. 2703 provides that, in the absence of a contrary agreement, usage or custom, the rent is payable at the address provided by the lessor and, in the absence thereof, at the address of the lessee.
One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract was performed, particularly if performance has been consistent for a period of many years. Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992). The intent of the contracting parties is an issue of fact which is to be inferred from all of the surrounding circumstances. La. C.C. art.2045.
The lease agreement, even as late as the 1935 Amendment, required payment of the royalty to be sent to the Bastrop Bank. As the trial court noted, apparently through the years, the parties agreed that the payments were to be sent to the individual lessors at their own addresses. Accordingly, Fannie Taylor and her heirs received their payments at the |26W- Jefferson address in Bastrop. When Gas Masters acquired its interest in the lease, and the concurrent obligation to pay the lessors, it began making the payments from the dec sheet provided by its ancestor in title, Pennzoil. Several of those payments were received and negotiated by Winberry even though she had moved from the address in Louisiana to South Carolina.
The testimony of landman Ricky Collins established that the usage and custom in the gas business, and in this field in particular, was for lessors to provide the lessee with any change of ownership or change of address. Jacobs (Gas Masters’ owner) testified that his company writes hundreds of checks to lessors each year, and it is impossible to know if payees relocate, die or sell their property unless the payees provide notification of their status changes.
We disagree with the finding of the trial court that it was Defendants’ obligation to pursue knowledge of lessors’ changes of address and/or ownership in the properties upon which monies were due. Plaintiffs were in a much better position to be aware of address and/or ownership changes regarding property they owned. They certainly had knowledge that Winberry moved to South Carolina to live with the Rosses and of ownership changes to the property resulting from the deaths of Win-berry and Nancy Ross. For these reasons, we find that the trial court erred in finding that the ipso facto clause was still *958 in existence in the 1935 Amendment and that the resolutory condition of nonpayment was caused by the fault of Defendants. Therefore, the assignments of error raised in regard to this issue are found to have merit.

127The application of the Louisiana Mineral Code

Several issues were raised during the trial of this case, and on appeal, which required the application of provisions of the Louisiana Mineral Code. The issues concerned whether Plaintiffs are required to put Defendants on notice that the royalties had not been paid before seeking termination of the lease, the effect of the July 2008 letter by the Holleys to Enervest, the effect of the letter from Mr. Trowbridge to Enervest and Devon, and whether Gas Masters’ tender of all the royalties due since 1998 prevented Plaintiffs from seeking dissolution of the lease.
The trial court’s judgment found that the Holleys’ letter in 2008 alerted Defendants to the Rosses’ identity as owners of the property in excess of 30 days before Defendants attempted to tender payment for the unpaid years, which the trial court opined provided an alternative basis for termination of the lease. The trial court noted that, if it had found that the annual payment was a royalty rather than a rental payment, the Louisiana Mineral Code, in particular, La. R.S. 31:137, would have mandated that written notice be given by Lessors of nonpayment. La. R.S. 31:138 would have provided that Lessees could cure any defects by making payment in full within 30 days of the notice. The trial court determined that the Holleys’ letter notified Defendants that they had acquired an interest in the Ross property and that all applicable royalties should be forwarded to them. The letter which Enervest returned to the Holleys did not include a tender for payment within the 30 days envisioned by La. R.S. 31:138.
| ^Defendants argued that, because the $3,000 annual payment is a royalty, the provisions of the Louisiana Mineral Code apply. Accordingly, Defendants assert that, under the protection of that Code, they were entitled to written notice from lessors that royalties were due to them, and Defendants’ immediate payment upon receipt of such notice protects them against the consequence of termination of the lease for nonpayment.
Defendants argue that the letter sent by the Holleys was not a demand for royalties, but, instead, was simply a notification that they had purchased land owned by the Rosses. The letter did not make any reference to the Sandidge lease and did not in any way indicate a failure on Defendants’ part to make royalty payments. The lessees were not put on notice of any issue regarding past due royalties and the letter did not inform them that the Holleys were successors to the interest of Winber-ry. Defendants point out that, in 1998, the Rosses were not even aware there were any unpaid royalties. For these reasons, Defendants argue that the trial court erred in its finding that the 2008 letter from the Holleys constituted written demand as required by La. R.S. 31:137.
La. R.S. 31:137 states if a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he must give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease. La. R.S. 31:138 states that the lessee shall have 30 days after receipt of the required notice within which to pay the royalties due or to respond by stating in writing a reasonable cause for nonpayment. La. R.S. 31:139 provides that if the lessee pays thej^royalties due in response to the required notice, the remedy of dis *959 solution shall be unavailable unless it is found that the original failure to pay was fraudulent. The court may award as damages double the amount of royalties due, interest on that sum from the date due and a reasonable attorney fee, provided the original failure to pay royalties was either fraudulent or willful and without reasonable grounds. In all other cases, such as mere oversight or neglect, damages shall be limited to interest on the royalties computed from the date due and a reasonable attorney fee if such interest is not paid within 80 days of written demand therefor. La. R.S. 31:140 provides that, if the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, the court may award as damages double the amount of royalties due, interest on that sum from the date due and a reasonable attorney fee regardless of the cause for the original failure to pay royalties. The court may also, in its discretion, dissolve the lease. La. R.S. 31:141 provides that, in a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice.
In Rivers v. Sun Exploration, 559 So.2d 963 (La.App. 2d Cir.1990), this Court noted:
The Official Comment to La. R.S. 31:137 states it was the intent of Mineral Code Articles 137-140 to provide the lessors with a meaningful remedy while simultaneously giving operators who have made substantial investments in producing properties the security of title which the nature and size of their investment deserves. It is noted that lessors are entitled to |ansome meaningful remedy besides recovery of interest which will assure they will receive timely payment of the production royalties but, on the other hand, the harshness of canceling a lease which may involve the investment of millions of dollars because of nonpayment of an insignificant sum of money is obvious. The Comment further notes that Mineral Code Article 137 contemplates that at any time there has been a nonpayment of royalties, the lessor must notify the lessee. It is not intended that this notice be a demand for performance as in the case of the traditional default under the Louisiana Civil Code since the lessor may not desire performance. Rather, the device of notice is merely to inform the lessee he has not paid royalties deemed by the lessor to be due. Article 138 allows the lessees 30 days within which to respond to the notice either by paying or stating a reasonable cause of nonpayment. Payment or nonpayment or stating or failing to state a reasonable cause for nonpayment in response to the notice has consequences for the lessor and lessee as to the remedies available pursuant to the Mineral Code. The total effect of the articles is to provide a spur to timely payment of royalties due while giving lessees a reasonable way in which to avoid the harsh remedy of cancellation.
This statutory scheme evidences a legislative determination that a mineral lessor does not have a right of action to judicially complain of the failure of his lessee to make timely or proper payments of royalties until he gives written notice of such failure to his lessee and allows him 30 days after receipt of the required notice to either pay the royalties due or state the reasonable cause for nonpayment. The notice requirements set forth in La. R.S. 31:137 are an indispensable prerequisite to a judicial demand for dissolution of the lease *960 or damages. The 30-day notice period requirement affords the lessee an opportunity to evaluate the nonpayment problem and then to make an informed decision as to whether the accrued royalties should be paid. 559 So.2d at 968, 969
The adequacy of the notice is determined on a case-by-case basis giving due consideration to the particular facts of each case. In Rivers, supra, the court concluded that the letter sent was inadequate to put the lessees on notice that royalties were being demanded. Instead, the court found the manner in which the notice was drafted was such that it may have motivated the defendants to investigate only a pricing issue rather than a | S1 deficiency in royalty payments. The court determined it would be error to penalize the defendants for failing to completely audit the payment and production records as opposed to merely investigating the pricing issue.
A reading of the letter from the Holleys to Enervest appears to be merely an introductory letter explaining why they are writing and introducing themselves as purchasers of Ross property. Although the Holleys request that any royalties formerly sent to the Rosses be sent to them, they did not indicate that they were requesting royalties from the Sandidge lease or that any royalties were past due. The letter contains no demand for royalties which would satisfy the requirements of La. R.S. 31:137. Therefore, it was error for the trial court to conclude that the Holley letter would put Defendants on notice that a demand for royalties had been made either by the Holleys or the Rosses.
Having reached the conclusion that the 2008 letter from the Holleys did not meet the requirements of a demand letter under La. R.S. 31:137, we next address the Trowbridge letter sent in April 2009 to Enervest and Devon. Enervest and Devon transmitted a copy of the letter to Gas Masters, which was responsible for the payment of monies due to the San-didge lessors; and, within 30 days, Gas Masters responded to Plaintiffs’ attorneys and tendered a payment for all the monies it deemed due to them, regardless of the passing of prescriptive periods, and with an explanation as to why the payments had not been made.
We find this response by Defendants met the requirements of La. R.S. 31:138; as a result, Plaintiffs are prohibited from seeking dissolution of |sgthe lease in accordance with La. R.S. 31:140. For the foregoing reasons, the assignments of error related to those issues governed by the Louisiana Mineral Code have merit.

The order concerning the accounting

Plaintiffs’ petition prayed that Defendants be ordered to provide an accounting to them of all oil, gas and other mineral production attributable to their interest in the mineral rights and to property covered by the lease and that, following the rendition of such accounting, Defendants pay Plaintiffs 100 percent of the value of all production attributable to those interests recovered and sold from the property.
The trial court’s judgment provided as follows:
Within thirty days from the date upon which the Judgment in this case becomes final and all appellate delays have run, defendants shall provide an account to plaintiffs of any gas or other mineral production related to plaintiffs’ fractional interest in this mineral lease from November 3, 1999, to the date of the Judgment. This accounting shall set forth total production, sales and deductions attributable to plaintiffs’ interest in the Lease, along with defendants’ statement of monies due plaintiffs based on their accounting.
*961 The trial court’s reasons for judgment indicate that, after the accounting, Plaintiffs will have the opportunity to traverse the accounting; and, eventually, the trial court “expects the parties will file the appropriate pleadings with the Court to resolve that issue.” The judgment states that, if Plaintiffs traverse the accounting, then “all monies due plaintiffs shall be due within thirty days of the Court’s entry of a Judgment setting the amount owed to plaintiffs.
| ¡^Defendants have claimed that the trial court erred in requiring that the lease be released and an accounting be rendered to award Plaintiffs’ 3/8 of all revenues, less applicable costs and deductions, produced from the lease since 1998. They claim that this accounting has been “postponed” pending the outcome of the appeal.[2]
This portion of the judgment is proee-durally awkward. It is not to have any effect until a final judgment is rendered and all appellate delays have run. The trial court anticipates the filing of further documentation and the rendition of another judgment establishing the amount of damages owed Plaintiffs for royalties that should have been paid since 1998, and to which Defendants might have some defenses. Therefore, there is nothing for this court to review at this point except the order that an accounting take place.
Since it is clear the Plaintiffs are entitled to recover some amount from Defendants for the royalties that have not been paid in recent years, and that amount has not yet been adjudicated in the trial court, this matter will be remanded to the trial court for further proceedings consistent with this opinion.

CONCLUSION

We find that the monies due Plaintiffs were royalties, rather than rent. The ipso facto termination clause did not survive the 1935 Amendment, and the lease was not automatically terminated upon nonpayment of the royalties due the Rosses, Plaintiffs did not notify Gas Masters until 2009 that royalties were due. Since Gas Masters and the other Defendants had a ^reasonable explanation for the failure to pay; j.e., they did not have a current address for payees to send the payments, ancj ⅛6 failure to pay the royalties due was nof willful or fraudulent, termination of the lease was not relief that was available to Plaintiffs.
Further, upon the demand for payment of the past due royalties in 2009, Defendants responded in a timely fashion and tendered, the full amount they had reserved for payment, regardless of whether some claims had already prescribed. Plaintiffs refused this offer of settlement, and Defendants reserved the right to raise any defenses to Plaintiffs’ action. The issue of payment for sums past due has not yet been adjudicated in the trial court. For these reasons, this matter is hereby remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are assessed to Plaintiffs, Arthur W. Ross, Nicole Ross, James Boyd Holley and Susan Duncan Holley.
REVERSED AND REMANDED.
APPLICATION FOR REHEARING
Before BROWN, C.J., and DREW, MOORE, LOLLEY & PITMAN, JJ.
Rehearing denied.
BROWN, C.J., and MOORE, J., would grant rehearing.

. By 1994, Bill Ross was a ½ owner of the minerals since he inherited 1/4 interest when his grandmother Fannie Taylor died, and 1/4 interest when his sister, Nancy Ross, died. Winberry had been receiving the check in Bastrop, written to the Fannie Taylor Estate, and apparently had not informed Bill that she had received his payment.

. After raising this issue as an error on appeal, Defendants failed to specifically address the propriety of the order for the accounting or the procedural issue involved.