WILLIAMS, J.
_JjThe plaintiffs, Samuel R. Guy and Janet M. Guy, appeal a district court judgment denying their motion for summary judgment and granting the defendants’ cross-motion for summary judgment. For the following reasons, we affirm.
FACTS
The plaintiffs are the owners of a 140-acre tract of immovable property located, in DeSoto Parish.[1] On March 23, 2004, the plaintiffs and defendant, Long Petroleum, L.L.C. (“Long”), entered into an oil, gas and mineral lease (“the Lease”). The Lease contained a primary term of three years, with an option for the lessee to extend the primary term for an additional two years. Long exercised the option and the primary term of the Lease was extended to March 23, 2009. The Lease also included a habendum clause,[2] a continuous drilling operations clause,[3] a traditional Pugh clause,[4] a horizontal Pugh clause[5] *179 and an assignment clause.[6]
I ¡¿Effective February 13, 2007, the Commissioner of Conservation formed the HOSS RA SUR Unit, which included the following described property:
The Southwest Quarter (SW-1/4) of Section" 25, the Northwest Quarter (NW-1/4) of Section 36, the Northeast Quarter (NE-1/4) of Section 35, and the Southeast Quarter (SE-1/4) of Section 26, all in Township 12 North, Range 13 West, DeSoto Parish, Louisiana.
|3On August 1, 2008, Long executed an “Assignment, Bill of Sale and Conveyance” of the Lease in favor of Empress, L.L.C. (“Empress”). This assignment transferred to Empress “[a]ll of [Long’s] rights, title and interest in and to all oil and gas leases and subleases,” “all rever-sionary interests, backin interests, overriding royalty interests * * *, and production payments,” whereby the assignee “hereby assumes all duties, liabilities and obligations, express or implied, imposed upon Assignor under the provisions of the Leases[.]”- The assignment reserved to Long all rights, title and interest in strata and depths from the surface to the" base of the Cotton Valley formation.
Thereafter, Long assigned overriding royalties - in the Lease to a number of assignees. On April. 28, 2009, Empress executed an identical “Assignment, Bill of Sale and Conveyance” of the Léase in favor of PXP Louisiana Operations, L.L.C. (“PXP”) and Larchmont Resources, L.L.C. (“Larchmont”).
No well was drilled upon the plaintiffs’ subject tract during the primary term of the Lease. However, the plaintiffs’ tract became unitized with an adjacent tract of land. At' some point during the primary term, Long entered into an operating agreement with Pinnacle Operating Co. (“Pinnacle”) to drill a well on the unitized tract. On January 16, 2009, approximately two months before the primary term of the Lease expired, Pinnacle spudded a well, the “Edwards No. 1.” - In June 2009, Pinnacle -completed the well to 8,200 feet in *180 the Hosston gas formation. Edwards No. 1 was in production as a gas well through December 31, 2011.
UMeanwhile, on August 6, 2009, Chesapeake Operating, Inc., (“Chesapeake”) applied for a permit to drill a well to test the Upper Haynesville Shale formation. The site of the well was not on the plaintiffs’ tract, but on an adjacent tract. However, on August 27, 2009, the Department of Conservation unitized the plaintiffs’ tract with the adjacent tract to explore the Haynesville Shale.
On September 21, 2009, Chesapeake spudded a gas well, the “Yarbrough No. 1,”[7] into the Haynesville Shale. The Yar-brough No. 1 was designated as the “unit well” for the HA RA SU HH unit. The well was drilled in a compulsory drilling unit that encompassed the entirety of the leased premises. The Yarbrough No. 1 well was completed on June 30, 2010, and has been in production ever since.
On March 23, 2011, the plaintiffs mailed a certified letter to Long, Pinnacle and Chesapeake.[8] In the letter, the plaintiffs stated that they “believe[d] that the Lease expired by its own terms on March 23, 2009, before the HA RA SU HH Unit was formed.” The plaintiffs requested that Long, Pinnacle, Chesapeake, EOG “and any other working interest owners in the Lease please execute and return” a release. In a related affidavit, the plaintiffs attested that at the time, they were unaware that Long had assigned any rights under the Lease. Consequently, the letter was not sent to Empress or PXP.
Thereafter, on March 5, 2012, the plaintiffs sent a certified letter to | ¡¿Long, Empress, PXP, Chesapeake and Chesapeake Energy Corporation. In that letter, the plaintiffs requested that the parties execute a partial release as to the “deep rights,” ie., “all depths 100 feet below the deepest depth in the Edwards No. 1 Well in accordance with [the provisions of the] Lease.” In May 2013, the plaintiffs sent a certified letter to Long and its assignees, demanding a release of all “shallow rights.” None of the parties complied with the plaintiffs’ request.
On March 15, 2012, defendants released the Lease as to “all strata 100' below the stratigraphic equivalent of the Haynesville Shale formation” pursuant to the horizontal Pugh clause of the Lease. Nevertheless, this clause in the Lease provided that it was “subject to the continuous drilling provisions contained in the lease.”
On August 14, 2012, the plaintiffs filed a lawsuit entitled “Petition for Termination or, alternatively, Partial Termination” of the Lease. The plaintiffs named Empress, PXP and Long as defendants. The plaintiffs alleged that the Lease had terminated because the Lease was horizontally divided as a result of an assignment of the “deep rights,” and operations had not been conducted on either horizontally divided depth of the leased premises sufficient to maintain the Lease as to that horizon.[9] On December 12, 2013, the plaintiffs amended their petition to name the parties to which Long had assigned overriding royalties.[10]
*181 | (¡Long filed an answer denying the plaintiffs’ allegation that the assignments had horizontally divided the lease. Long asserted that it had “conducted operations sufficient to maintain the lease as to the entirety of the leased premises, including all acreages and depths of the leased premises in accordance with the terms of the lease.” Empress, PXP, Larchmont and the remaining defendants filed answers and asserted various affirmative defenses. These defendants also alleged that they had complied with the obligations and conditions of the Lease arid that the Lease had not terminated, due to “continued mineral operations, drilling of new wells, production of minerals, payment and acceptance of royalties by Plaintiffs, and other acts consistent with the effectiveness of the lease[.]”
On March 25, 2014, the plaintiffs filed a motion for summary judgment, arguing that Long’s execution of the “Assignment, Bill of Sale and Conveyance” of the deep rights constituted a division of the Lease. They also argued that neither Long nor its assignees took any action to develop the deep rights during the primary term of the Lease. Therefore, according to the plaintiffs, the deep rights portion of the Lease expired at the close of the primary term (March 23, 2009), and, as a result, the spudding of Yarbrough No. 1, in September 2009, was ineffective. Further, the plaintiffs conceded that as to the Edwards No. 1, Long maintained the |7shallow rights until it was shut in (December 2011). However, the plaintiffs argue that, under the language of the continuous drilling operations clause, the Lease expired 90 days after Edwards No. 1 was shut in.
The deféndants opposed the plaintiffs’ motion for summary judgment and filed a cross-motion. They argued as follows: (1) there was no division of the Lease into separate “deep” and “shallow” leases; (2) continuous drilling operations had been conducted beyond the term of the primary lease; (3) production from the Yarbrough No. 1 well has been continuously in progress without interruption; and (4)' with regard to Yarbrough No. 1, the defendants had already released the depths 100 feet below the formation of the deepest depth drilled.
Following a hearing, the district court denied the plaintiffs’ motion for summary judgment and granted summary judgment in favor of defendants. In its written reasons for summary judgment, the court stated:
[[Image here]]
It cannot be overlooked that the terms of this Lease have been met. • The defendants have developed the leased premises in accordance with the Lease, and plaintiffs have received what they bargained for in terms of production and development.. Here, at the expiration of the primary term, the Edwards well maintained the entire Lease. Within 90 days of completion of. the Edwards well, the Yarbrough well was- commenced thus maintaining‘the deep rights pursuant to the continuous drilling clause. Plaintiffs do not dispute this. Although the Edwards well ceased producing, the Yarbrough well’s production continues *182 to hold the entire Lease. In short, while an assignment could trigger lease division, it does not diminish the rights of the original lessee to perform under the terms of the Lease. Lessee was obligated only to perform under the Lease. Here, the terms of the Lease have been met, and as such, it is immaterial whether the transfer was an assignment |sor a sublease. To hold otherwise would alter the terms of the Lease, requiring the lessee and its assigns to perform within a shorter time frame than originally contracted.
[[Image here]]
(Internal citations omitted).
The plaintiffs now appeal.'
DISCUSSION
The plaintiffs contend the district court erred in granting summary judgment in favor of defendants. They argue that the transfer from Long to Empress constituted a partial assignment of the lease, which horizontally divided the Lease, into two separate and independent leases. The plaintiffs also argue that the document which purported to transfer the deep rights was, in fact, a sale because it was a “full assignment” of the deep rights. '
The interpretation of a contract typically presents a question of law that may be resolved by summary judgment. Hoover Tree Farm, L.L.C. v. Goodrich Petr. Co., 46,153 (La.App.2d Cir.3/23/11), 63 So.3d 159, writ denied, 2011-1225 (La.9/23/11), 69 So.3d 1161 and 2011-1236 (La.9/23/11), 69 So.3d 1162; Stephenson v. Petrohawk Props., L.P., 45,296 (La.App.2d Cir. 6/2/10), 37 So.3d 1145.[11] A mineral lease is a contract by |gwhich the lessee is granted the right to explore for and produce minerals in consideration of the payment of a rental. or bonus. LSA-R.S. 31:114; Odom v. Union Producing Co., 243 La. 48, 141 So.2d 649 (La.1961); Ross v. Enervest Operating, L.L.C., 48,229 (La. App.2d Cir.6/26/13), 119 So.3d 943, unit denied, 2013-2034 (La.11/15/13), 125 So.3d 1110; Hoover Tree Farm, supra. The law with regard to mineral leases is well settled.[12]
*183 | inThe lessee’s interest in a mineral lease may be assigned or subleased in whole or in part. LSA-R.S. 31:127. To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee’s obligations. LSA-R.S. 31:128. An assignor or sublessor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in writing. LSA-R.S. 31:129. A partial.assignment or partial sublease does not divide a mineral lease. LSA-R.S, 31:130.
In Hoover Tree Farm, supra, the plaintiff (Hoover) executed a mineral lease in favor of the defendant, Goodrich. Thereafter, Goodrich and Chesapeake entered into an “Assignment, Conveyance and Bill of Sale,” by which*Goodrich transferred/assigned to Chesapeake an undivided 50% interest in the lease and various other leases as to the rights below the Cotton Valley formation. A dispute arose with regard' to the payment of bonuses and royalties. This Court discussed the provisions of the lease in dispute and reviewed the definitions of the terms “successors” and “assigns”[13] as set forth in the Civil Code. Thereafter, we discussed the 11 jurisprudence pertaining to the subleasing and division of mineral leases. We concluded that the transfer between Goodrich and Chesapeake did not constitute a division of the lease and was not a sublease. Rather, it was “an assignment of an undivided interest in the incorporeal. immovable, the Lease.”
The "lease at issue in Hoover Tree Farm, supra, contained identical language as Paragraph 10 of the Lease in the instant ease. As stated above, Paragraph 10 provides, in pertinent part:
The rights of either" party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns[.] * * * An assign *184 ment of this lease, in. whole or part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessor or assignee of part or parts hereof . shall fail to comply with any other provisions of the lease, such default.shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease.
In the assignment at issue, Long retained 'the “shallow rights” under the Lease, while conveying the “deep rights” to Empress. More specifically, the assignment provided that it was a conveyance, assignment and transfer of “[a]ll of Assign- or’s right, title, and interest in and to all oil gas leases and subleases and further including working interests, mineral interests, royalty interests, rights of assignment and reassignment, net revenue interests and undeveloped locations under or in oil, gas or mineral leases and interest in rights to explore for and produce oil, gas and other minerals!,] * * * save and except” the formations and depths between the surface and the base of the Cotton Valley formation.
|taWe have reviewed this record in its entirety. Further, we have considered the pertinent provisions of the Mineral Code and the related jurisprudence. Under Louisiana law, the lessee of an oil, gas, and mineral lease has the power to transfer his interest by assignment in full, partial assignment or sublease, unless the lease itself prohibits a transfer. See, LSA-R.S. 31:127. Thus, it is clear that Long was permitted to assign its interest to Empress and any of the other entities “in full, partial assignment or sublease.” We find that the assignment of the interest in the Lease, from Long to Empress, did not constitute an impermissible division of the Lease. This assignment lacks merit.
The plaintiffs also contend the district court erred in failing to find that the lease terminated with respect to both the deep rights and shallow rights. According to the plaintiffs, under the terms of the Lease, the deep rights expired on March 23, 2009, and the Yarbrough No. 1 was not spudded until September 21, 2009. Further, the plaintiffs concede that Long did not assign the shallow rights. However, according to the plaintiffs, the Edwards No. 1 ceased production on December 31, 2011, and thereafter, no drilling, reworking or other operation was conducted which would have affected the shallow rights. As á result, plaintiffs argue that the Lease terminated as- of December 31,2011.
The provision of the Lease that pertains to its term provides:
2. Subject to the other provisions herein contained, this lease shall be for a period of three (3) years from the date hereof (called ‘primary term’) and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith, or (2) it is maintained in force in any other manner herein | ^provided.
An amendment to the Lease, “Exhibit A,” granted Long the option to extend the lease “for a period of two (2) years as to all or any portion of the acreage then held [under the Lease.]” It is undisputed that Long exercised its option and the Lease was extended.
Further, Paragraph 6, the “continuous operations clause” of the Lease, provides, in pertinent part:
If within ninety (90) days prior to the end of. the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if. production previously secured should cease from any cause, this lease shall continue in force and effect for *185 ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereof, or operations to achieve or restore production, or if production previously secured should cease from any cause after the - expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days, or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith.
[[Image here]]
(Emphasis added).
In Allen v. Continental Oil Co., 255 So.2d 842 (La.App. 2d Cir.1971), writ ref'd, 260 La. 701, 257 So.2d 156 (1972), we explained the phrase “engaged in drilling operations” as follows:
|uThe general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the bona ftde intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease.
If the lessee has performed such preliminary acts within the time limit, and has thereafter actually proceeded with the drilling to completion of a well, the intent with which he did the preliminary acts [is] unquestionable, and the court may rule as a matter of law that the well was commenced within the time specified by the lease.
255 So.2d at 845.[14]
In Cason v. Chesapeake Operating, Inc., 47,084 (La.App.2d Cir.4/11/12), 92 So.3d 436, writ denied, 2012-1290 (La.9/28/12), 98 So.3d 840, the parties entered into a lease with a term of five years, ending on May 31, 2010. The lease contained a clause which continued the lease as long as the lessee was “engaged in operations for drilling[.]” On May 28, 2010, the defendants entered the leased premises to cut trees and stack lumber; thereafter, they began building a road and well pad. As *186 suming that the lease l^had expired, the plaintiff leased the same tract to another company, which obtained a drilling permit. In the meantime, the defendants continued their work on the site, and a well was spudded on July 22, 2010. The plaintiffs filed a lawsuit, alleging that the work the defendants performed on the tract did not constitute “operations for drilling” sufficient to continue the lease beyond its primary term. The district court granted a preliminary injunction' in favor of the defendants, prohibiting the plaintiffs from interfering with the construction of the gas pipeline from the well. We affirmed, stating:
Chesapeake spudded the well on July 22, and by July 2011, had spent $8.5 million to bring it into operation. - Despite Mr. Cason’s pejorative view of Chesapeake’s motives, this evidence amply shows that the preliminary acts were done for the purpose of completing Ca-son 24.
In the instant case, the record reveals that the Department of Natural Resources, Office of Conservation, issued a permit to drill the .Edwards No. 1 well on December 23, 2008. In support of their cross-motion for summary judgment, defendants introduced into evidence Pinnacle’s daily drilling reports and the affidavit of Richard Haley, a drilling and completion consultant for Pinnacle. According to the evidence .submitted, the Edwards No. 1 well was spudded on January 16, 2009, approximately two months before the end of the primary term of the Lease. Haley attested as follows: drilling of the Edwards No. 1 continued through January 26, 2009 “when a total depth of 8,200 feet was reached”;, the.drilling rig was released on January 28, 2009; fracking operations of the well commenced on June 19, 2009 and concluded on June 24, 2009; the Edwards No. 1 “flowed to sales” on June 29, 2009, and continued in, production through December 31, 2011; hfisince commencement,'there had-never been a gap of 90 days' in the operations prior to completion of the well; and although the well was presently shut in, it had “future production potential.” There-is no evidence of record to indicate that there was a lapse inactivity for any 90-day period.,,
The evidence also reveals that Chesapeake was- granted a permit to drill the Yarbrough No. 1 on August 11, 2009. Defendants introduced into, evidence the. affidavit -of Martin Howell, a Landman II for .Chesapeake. Howell attested as follows: as part of his duties, he oversaw and administered mineral leases owned by Empress in the HA RA SU HH unit in DeSo-t,o. Parish; the leased premises at issue are located within the boundaries of that unit; the HA RA SU HH unit was formed effective August 25, 2009; preparatory activities for the drilling of the Yarbrough No. 1 well commenced on August 10, 2009; the well was spudded on September 21, 2009; the Yarbrough No. 1 well was completed' on June 30, 2010; and, there has not been a gap of 90 days since drilling operations commenced. After reviewing this entire record, we find that the district court did not err in granting summary judgment in favor of defendants. After Long exercised its option to extend the Lease, the primary term was extended to March 23, 2009. It is undisputed that Pinnacle spudded the Edwards No. 1 well on January 16, 2009, which was clearly prior to the expiration of the primary term of the Lease. The Edwards No. 1 continued in production until December 31, 2011. During that -toe, operations commenced on the Yarbrough No. 1, which eventually spudded on September 21, 2009. Therefore, we find that on March 23, 2009 — the date upon which the 117primary term would have expired— defendants were “engaged in operations for drilling, completion or reworking, or [in] operations to achieve or restore production, with no cessation between operations or between such cessation of produc *187 tion and additional operations of more than ninety (90) consecutive days,” Consequently, we agree with, the district court that the Lease was extended beyond the primary term by the “continuous drilling operations” that occurred in this case.
CONCLUSION
For the reasons set forth herein, we affirm the district court’s summary judgment in favor of defendants. Costs of this appeal are assessed to the plaintiffs, Samuel R. Guy and Janet M. Guy.
AFFIRMED. .

. - The property is described as follows:

TOWNSHIP 12 NORTH-RANGE 13 WEST

Section 36: Northwest Quarter (NW-1/4), LESS' AND EXCEPT: East Half of the' East Half of the East Half of the Northwest Quarter (E-l/2 of E-l/2.of E-l/2 of NW-1/4).

. Paragraph 2 continues the lease in , effect "as long thereafter as” oil or gas is produced from the leased premises or land pooled therewith, or the lease "is maintained in force in any other manner herein provided.”

. Paragraph 6 provides that if within 90 days of the end of the primary term, the lessee completes or abandons a well on the leased premises or lands pooled therewith, the lease continues in force and effect for 90 days from -such completion; at the end of that 90 days, even if oil or gas is not being produced, the lease "shall remain in force so long thereafter as lessee * * * is engaged in operations for drilling, completion or reworking[.]”

.Ex. A, Paragraph 3 provides:
In the event a portion or portions of the land leased is pooled or unitized with other land so as to form a pooled unit or units, operation on, completion of a well upon, or production from such unit or units will not maintain this lease in force as to the land not included in such unit or units. The *179 lease may be maintained in force as to any land covered hereby and not included- in such unit or units in any manner provided herein.

. Ex. A, Paragraph 4 provides:
It is understood and agreed that this lease shall terminate at the expiration of the primary term as to all depths 100 feet below the deepest depth in any well drilled on the leased premises or on lands pooled therewith, subject however to the continuous drilling provisions contained to this lease,

. Paragraph 10 provides:
The ■ rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties, shall be binding upon Lessee for any purpose until such person" acquiring an interest has furnished Lessee, at its principal place. of- business, with a certified copy of the instrument or instruments, constituting his claim or title from the original Lessor. An assignment of this lease, in whole or part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessor or assignee of part or parts, hereof shall fait to comply with any other provisions of the lease; such default shall not affect this lease ’ insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to Lessor or file for record a release or releases of this lease as to any- part or all of said land or of any - mineral or .horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest. •
*180 (Emphasis added).

. In some portions of the record, the name of the well is spelled "Yarborough.”

. The letter was also sent to EOG Resources, Inc., which complied with the plaintiffs’ request, EOG Resources, Inc. is not a party in these proceedings.

. Additionally, the plaintiffs alleged that EOG, Chesapeake and Chesapeake Energy Corporation did not own a worldng interest in the Lease and were not necessary parties to this action,

. Those parties are as follows: J.R. Webb, Inc., S.R. Herbel, Inc., C.L. Brown, III, PC Hudson Oilfindr, LTD., David Scott Hudson, *181 Webb Company, Inc., WEMO, Inc., Gregory B. Mobley, Security Exploration, Inc., Richard Cummins, TLC Enterprises, Dr. Oliver Sartor, James Services, L.L.C., WEBCO, Inc., Seagull Ventures, IV, Bienville Investments, SOG, L.L.C., Energy Equities, Inc., Wayne L. Simpson, William .H. Flaherty, The JNB Trust, Doreck Oil Company, Inc., Penelope L. Mobley, 13 Energy, Inc., LPM Energy, Inc., Geoff L. Roberts, APAC, Anthony E. Swisher, David G. Benscoter, Kevin O. Long, Scott S. Lowe, John Baker Barr, Jr. ánd Larchmont Resources, L.L.C.

. The statutory and case law regarding motions for summary judgment is as follows:
A motion for summary judgment is a procedural device, used when there is no genuine issue of. material fact for all or part of the relief prayed for by a litigant. It is reviewed on appeal de novo, with' the appellate court Using the same criteria that govern the trial court’s determination of whether summary judgment is appropriate; i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Reynolds v. Bordelon, 2014-2371 (La.6/30/15), 172 So.3d 607; Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880.
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966. The mover has the burden of establishing the absence of a genuine issue of material fact. If the mover will not bear the burden of proof at trial on the matter, the mover is required to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim or action. Id. A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success or determines the outcome of the legal dispute. A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. King v. Illinois Nat. Ins. Co., 2008-1491 (La,4/3/09), 9 So.3d 780; Todd v. Angel, 48,687 (La.App,2d Cir, 1/15/14), 132 So.3d 453, writ denied, 2014-0613 (La.5/16/14), 139 So.3d 1027.

. Like contracts in general, a mineral lease is- the law between the parties and regulates their respective rights and obligations. Ross, *183 supra; Winnon v. Davis, 32,988 .(La.App:2d Cir.5/15/00), 759 So.2d 321; see also LSA-C.C, art. 1983. Mineral leases are construed as leases generally, and the provisions of the Civil Code applicable to ordinary leases, when pertinent, are applied to mineral leases. State v. Louisiana Land & Expl. Co., 2012-0884 (La. 1/30/13), 110 So.3d 1038; Caskey v. Kelly Oil Co., 1998-1193 (La.6/29/99); 737 So.2d 1257; see also LSA-R.S. 31:2.
The purpose of contract interpretation is to determine the common intent of the parties. LSA-C.C. art. 2045; Hoover Tree Farm, supra; Stephenson, supra. The words used in a contract are to be given their generally prevailing meaning unless théy are words of art'' or have acquired a technical meaning. LSA-C.C. art. 2047. When the words of a contract are susceptible of different meanings, they must be interpreted as having the meaning that best conforms to the object of the contract. LSA-C.C. art. 2048. Each provision in a contract must be interpreted in light .of the other provisions so that each is given the meaning suggested by the contract as a’ whole,. LSA-C.C, art.- 2050. When the parties make no provision for a particular sittiati'on, it must be assumed that they intended to' bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. LSA-C.C. art. 2054.
The determination of whether a contract is clear or ambiguous is a matter of law. Hoover Tree Farm, supra; Stephenson, supra. Ambiguity exists as to the parties’ intent when the contract lacks a provision on the issue or when the language of the contract is uncerr tain or fairly susceptible to more than one interpretation. Hoover Tree Farm, supra; Rogers v. Horseshoe Entertainment, 32,800 (La.App.2d Cir.8/1/00), 766 So.2d 595, writs denied, 2000-2894 (La. 12/8/00), 776 So.2d 462, 2000-2905 (La. 12/8/00), 776 So.2d 464.

. LSA-C.C. art. 3506(5) provides:
Assigns. — Assigns means those to whom rights have been transmitted by particular title; such as sale, donation, legacy, transfer or cession.

. In Breaux v. Apache Oil Corp., 240 So.2d 589 (La.App. 3d Cir.1970), the court found that building a board road and turnaround to the well location satisfied a clause requiring the lessee to "commence operations for the drilling of a well” before the expiration of the lease. In Hilliard v. Franzheim, 180 So.2d 746 (La.App, 3d Cir. 1965), the court found that staking the site, obtaining a drilling permit, moving lumber onsite and leveling the well location, building a board road and placing drilling equipment nearby satisfied a clause requiring the well "to be started” with-ín a specified time. In Johnson v. Houston Oil Co., 229 La. 446, 86 So.2d 97 (1956), the court found that hiring a drilling contractor, getting a drilling permit and moving drilling equipment onsite constituted "drilling or reworking operations” sufficient to extend the lease. In Crye v. Giles, 200 So, 155 (La.App. 2d Cir.1941), this court held that erecting a derrick, digging a slush pit and laying drill stem on the ground were activities sufficient to maintain a lease which would expire unless "operations for drilling are commenced” by a certain date.